UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                                        :

UNITED STATES OF AMERICA

                                                        :

           - v. -

                                                        :        20 Cr. 500 (JGK)

ARTHUR HAYES,
BEN DELO, and                                           :
SAMUEL REED

                                                        :

                    Defendants.

                                                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### GOVERNMENT'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO COMPEL PURPORTED *BRADY* MATERIAL AND RULE 16 DISCOVERY

                                        AUDREY STRAUSS
                                        United States Attorney
                                        Southern District of New York
                                        One St. Andrew's Plaza
                                        New York, New York 10007


Jessica Greenwood
Samuel Raymond
Assistant United States Attorneys

        - Of Counsel -

**TABLE OF CONTENTS**

FACTUAL BACKGROUND..................................................................................................... 1

    A. Overview of the Charges and Discovery ............................................................... 1

    B. The USAO and the CFTC's Parallel Investigations............................................... 4

    C. The Witness-1 Devices......................................................................................... 11

LEGAL STANDARDS ........................................................................................................ 16

    A. *Brady & Giglio*.................................................................................................... 16

    B. Rule 16 ................................................................................................................. 18

    C. Joint and Parallel Investigations........................................................................... 19

ARGUMENT........................................................................................................................ 21

    A. The Motion to Compel Review and Disclosure of the CFTC's Complete File in a Parallel Investigation Should be Denied. ................................................................................ 21

    B. The Motion to Compel Production of the Witness-1 Devices Should Be Denied........... 31

CONCLUSION..................................................................................................................... 41

## TABLE OF AUTHORITIES

Cases

*Brady v. Maryland*, 373 U.S. 83 (1963) ...................................................................... passim

*Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986)............................................. 4

*Doe No. 4 v. Doe No. 1* (In re Grand Jury Subpoena), 103 F.3d 234 (2d Cir. 1996) .................... 6

*Douglas Oil Co. v. Petrol Stops N.W.*, 441 U.S. 211 (1979)......................................................... 6

*Giglio v. United States*, 405 U.S. 150 (1972) ....................................................... 11, 15, 39

*Riley v. California*, 573 U.S. 373 (2014) ................................................................. 40

*S.E.C.* v. *Dresser Industries*, Inc., 628 F.2d 1368 (D.C. Cir. 1980) ..................................... 22

*S.E.C. v. Stanard*, No. 06 Civ. 7736 (GEL), 2007 WL 1834709 (S.D.N.Y. June 26, 2007).. 23, 26

*United States v. Avellino*, 136 F.3d 249 (2d Cir. 1998)................................................................. 24

*United States v. Bagley*, 473 U.S. 667, 678 (1985) ...................................................................... 17

*United States v. Blaszczak*, 308 F. Supp. 3d 736 (S.D.N.Y. 2018)......................................... 23, 27

*United States v. Bronfman*, No. 18CR2043NGGVMS, 2019 WL 1332888 (E.D.N.Y. Mar. 25, 2019) .................................................................................................................................. 35

*United States v. Carroll*,  No. 19 Cr. 545 (CM), 2020 WL 1862446 (S.D.N.Y. Apr. 14, 2020) . 33

*United States v. Chow*, No. 17 Cr. 667 (GHW), ECF No. 69...................................................... 23

*United States v. Collins*, 409 F. Supp. 3d 228 (S.D.N.Y. 2019)..................................... 23, 36, 40

*United States v. Coppa*, 267 F.3d 132, 139-40 (2d Cir. 2001) ....................................... 17, 19, 38

*United States v. Douglas*, 525 F.3d 225 (2d Cir. 2008)............................................................... 19

*United States v. Finnerty*, 411 F. Supp. 2d 428 (S.D.N.Y. 2006)................................................ 21

*United States v. Gaggi*, 811 F.2d 47 (2d Cir. 1987) ................................................................. 34

*United States v. Gallo*, 98 Cr. 338, 1999 WL 9848 (S.D.N.Y. Jan. 11, 1999) ............................. 19

*United States v. Goffer*, No. 10 Cr. 56 (RJS), ECF No. 90 (S.D.N.Y. July 29, 2010) ................. 26

*United States v. Gupta*, 848 F. Supp. 2d 491 (S.D.N.Y. 2012) ................................ 25, 26, 28, 30

*United States v. Haller*, 837 F.2d 84 (2d Cir. 1988)................................................................. 6

*United States v. LeRoy*, 687 F.2d 610, 619 (2d Cir. 1982) ....................................................... 17, 18

*United States v. Maniktala*, 934 F. 2d 25, 28 (2d Cir. 1991)....................................................... 21

*United States v. Martoma*, 990 F. Supp. 2d 458 (S.D.N.Y. 2014) ......................................... 26, 28

*United States v. Middendorf*, 18 Cr. 36 (JPO), 2018 WL 3956494 (S.D.N.Y. Aug. 17, 2018) .. 23, 27

*United States v. Payne*, 63 F.3d 1200, 1210 (2d Cir. 1995) .................................................. 17, 18

*United States v. Perez*, 940 F. Supp. 540 (S.D.N.Y. 1996) ....................................................... 20

*United States v. Perman,* No. CR1801015001TUCRMEJM, 2020 WL 2812834 (D. Ariz. May 29, 2020) .................................................................................................................................. 43

*United States v. Persico*, 645 F.3d 85, 111 (2d Cir. 2011) ...................................................... 18, 39

*United States v. Rigas*, No. 02 Cr. 1236 (LBS), 2008 WL 144824 (S.D.N.Y. Jan. 15, 2008), *aff'd*, *United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009) ....................................................... 21, 23, 26

*United States v. Rivera*, 16 Cr. 175 (LGS), 2017 WL 1843302 (S.D.N.Y. May 8, 2017) ........... 19

*United States v. Ruggiero*, 472 F.2d 599, 604 (2d Cir.), *cert. denied*, 412 U.S. 939 (1973)........ 17

*United States v. Savedoff*, 16-CR-41G, 2017 WL 2305751 (W.D.N.Y. May 25, 2017)............. 44

*United States v. Stevens*, 985 F.2d 1175, 1180-81 (2d Cir. 1993)................................................ 20

*United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006) ............................................................. 27

*United States v. Stewart*, 513 F.2d 957, 960 (2d Cir. 1975) ....................................................... 18

*United States v. Urena*, 989 F. Supp. 2d 253, 261 (S.D.N.Y. 2013) ....................................... 21

*United States v. Vasquez*, No. 15-CR-252 (PKC), 2021 WL 2186224 (E.D.N.Y. May 27, 2021) .................................................................................................................................... 41
*United States v. Yu*, 97 Cr. 102 (SJ), 1998 WL 57079 (E.D.N.Y. Feb. 5, 1998).......................... 20
*United States v. Zackson*, 6 F.3d 911, 918 (2d Cir. 1993) ......................................................... 18
*United States v. Zelaya-Romero*, No. 15 CR. 174 (LGS), 2018 WL 1033235 (S.D.N.Y. Feb. 21, 2018) ................................................................................................................... 19, 39, 45

## Statutes

18 U.S.C. § 3500 .................................................................................................. 3, 36, 37, 38

## Rules

Fed. R. Crim. P. 16 ............................................................................................................ passim
Fed. R. Crim. P. 6 ..................................................................................................................... 6, 15
........................................................................................................................................

The Government respectfully submits this memorandum in opposition to the two discovery motions (singularly, the "CFTC Motion" and "Witness-1 Device Motion" and collectively, the "Motions") filed by Arthur Hayes, Ben Delo, and Samuel Reed (the "defendants"). The defendants ask this Court to compel the Government to make certain disclosures of purported Rule 16 discovery and *Brady* materials and to force the Government to obtain documents wholly outside the possession of the Federal Bureau of Investigation and U.S. Attorney's Office. These requests are meritless.

There is no basis for the defendants' request that the U.S. Attorney's Office search the files of an independent investigating agency, to retrieve documents that are not exculpatory and are cumulative of the information already in the possession of the defense. The Witness-1 Device Motion is similarly a fishing expedition founded on attacks on a potential fact witness ("Witness-1"), which have no bearing on whether the data the defendants seek is actually discoverable. As set forth herein, the Government has taken a broad view of its discovery obligations in this case and has complied (and continues to comply) with Rule 16, *Brady*, *Giglio*, and the Jencks Act (well in advance of any applicable disclosure deadlines), through its disclosures to date. But the information sought by the defendants is simply not subject to disclosure. The Motions should be denied.

**FACTUAL BACKGROUND**

### A.  Overview of the Charges and Discovery

On October 1, 2020, the United States Attorney's Office for the Southern District of New York (the "USAO" or the "Government") unsealed a two-count indictment (the "Indictment")

1

charging the defendants, and co-defendant Gregory Dwyer,[1] for their roles in causing and conspiring to cause violations of the Bank Secrecy Act (the "BSA") from in or about September 2015 through in or about September 2020. Specifically, the defendants willfully caused and conspired to cause the Bitcoin Mercantile Exchange ("BitMEX")—an online cryptocurrency derivatives exchange that offered and solicited its services to thousands of U.S. customers—to violate U.S. law by willfully failing to establish, implement, and maintain a BSA-mandated anti-money laundering ("AML") program. Count One charges the defendants and Dwyer with aiding and abetting BitMEX's BSA violations, in violation of Title 31, United States Code, Sections 5318(h) and (l), 5322(a) and (c), Title 31, Code of Federal Regulations, Sections 1026.210 and 1026.220, and Title 18, United States Code, Section 2; Count Two charges them with conspiring to cause BitMEX to violate the BSA, in violation of Title 18, United States Code, Section 371.

As set forth in the Indictment, the defendants are the co-founders and majority owners of BitMEX. (Indictment ¶¶ 1, 9.) As alleged in the Indictment, and at all relevant times, BitMEX was a trading platform that offered financial derivatives tied to the value of cryptocurrencies. (Indictment ¶ 1.) Among other products, BitMEX allowed its customers to buy and sell futures contracts and swaps tied to the price of Bitcoin and other cryptocurrencies and accepted Bitcoin both to margin and to guarantee actual and potential trades. (Indictment ¶¶ 1, 13, 17, 18.) BitMEX, at all relevant times, offered and sold these commodity derivatives to U.S. customers, including individual retail customers. (Indictment ¶ 17.) Accordingly, BitMEX was at all relevant times a futures commission merchant ("FCM") required under the Commodity Exchange Act ("CEA") to register as such with the U.S. Commodity Futures Trading Commission (the "CFTC").

---

[1] As the Court is aware, Dwyer has not yet appeared in this case, and is thus not a party to the Motions.

(Indictment ¶ 18.)    As an FCM, BitMEX was required to implement AML and know-your-customer ("KYC") controls under CFTC rules and the BSA, which apply to registered and unregistered FCMs.  (Indictment ¶¶ 20–23.)  Despite each defendant knowing, from at least in or about September 2015, that BitMEX could not serve U.S. customers without complying with U.S. AML and KYC requirements, each defendant caused, and conspired to cause, BitMEX to continue to serve U.S. customers without such programs.  (Indictment ¶ 25.)  Each defendant had specific knowledge that BitMEX was serving U.S. customers after September 2015, including through their access to internal BitMEX reports which tracked and reported trading revenue by country monthly (the "country revenue reports"), among other information.  These reports indicated that U.S. customers were trading on BitMEX's platform from at least in or about November 2017 through at least in or about July 2018.  (Indictment ¶ 27.)

As of this filing, the USAO has produced hundreds of thousands of documents as Rule 16 material.  Those document productions include, *inter alia*, documents the USAO received from the CFTC pursuant to an access letter in a parallel CFTC investigation (described further below); returns from dozens of grand jury subpoenas; public records including from BitMEX's website; responsive returns from search warrants executed on email and other electronic accounts; and internal FBI reports.  The USAO has also produced or will soon produce the witness statements in its possession, including for individuals the USAO does not actually intend to call at the trial scheduled in this matter for March 2022 (which the USAO is under no legal obligation to produce and, even for anticipated witnesses, is being produced months in advance of any pretrial disclosure deadline).  The USAO is continuing to produce documents and witness statements in its possession as it obtains them.

### B.  The USAO and the CFTC's Parallel Investigations

The Indictment in this case was the result of parallel investigations (the "Criminal Investigation" and the "CFTC Investigation," respectively) into the operations of BitMEX and its principals by the USAO and the CFTC's Chicago Regional Office.

As the Court is well aware, the USAO is an arm of the United States Department of Justice, which is an executive agency responsible for enforcement of criminal laws in this country.  The CFTC is an independent regulatory agency charged with enforcing civil commodities laws.  *Cf. Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 836 (1986) (Congress "created an independent agency, the CFTC, and entrusted to it sweeping authority to implement the CEA.")

In this case, the Government understands from the CFTC that it opened its investigation into BitMEX on April 10, 2018, and that the Commission issued a formal order of investigation on October 4, 2018.[2]  The CFTC issued its first subpoena to BitMEX on November 8, 2018. ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████  Between the inception of the CFTC investigation and today's date, the CFTC has issued approximately 14 administrative subpoenas and three requests to foreign regulators for various categories of documents, and has interviewed witnesses.  Before July 25, 2019, the CFTC also conducted investigative testimony, namely formal testimony under oath, for five witnesses, including Delo, Reed, and Dwyer, all without any involvement by the USAO.

In July 2019, the CFTC made a criminal referral to the USAO.  Following the July 2019 criminal referral, the USAO assigned AUSAs to investigate potential violations of federal criminal

---

[2] The Government learned these details regarding the CFTC's investigation in June and July 2021, in preparation for this response.

law, and the FBI opened its investigation relating to the subject matter of the Criminal Investigation. On July 22, 2019, the assigned AUSAs met with CFTC staff by telephone to discuss their ongoing investigation. That same day, the CFTC granted an access letter submitted by the USAO and began producing certain portions of its then-existing investigative file to the USAO, including (1) documents obtained from BitMEX in response to the CFTC's subpoena; (2) documents obtained from BitMEX and approximately 10 other third parties; and (3) transcripts and exhibits from the investigative testimony conducted by the CFTC. Since these initial productions, the CFTC has periodically provided additional documents and information to the USAO, including copies of the defendants' and BitMEX's *Wells* briefing before the agency and a corporate privilege log. All of the CFTC materials in the current possession, custody, and control of the USAO have been produced to the defendants.

In July 2019, the USAO asked the CFTC about any information regarding Hayes' travel plans for his pending investigative testimony in New York; the CFTC provided the date, time, and location of Hayes's investigative testimony and other information it was aware of. The FBI then obtained details of Hayes's travel plans, and served Hayes with grand jury subpoenas at the airport prior to his outgoing flight on July 27, 2019. The CFTC later provided the USAO with an overview of Hayes's investigative testimony, and then copies of the investigative testimony transcript and exhibits. Consistent with its view of the secrecy obligations under Rule 6(e), the Government did not discuss or disclose the grand jury subpoenas with the CFTC.

The USAO conducted its Criminal Investigation in parallel with, and separate from, the CFTC Investigation. The USAO understands that the CFTC Investigation has focused on whether there had been civil or regulatory violations of the civil commodities laws, whereas the Criminal Investigation focused on whether there had been violations of federal criminal law, including, but

not limited to, violations of the Bank Secrecy Act's requirement that financial institutions implement AML policies; violations of U.S. sanctions laws under the International Emergency Economic Powers Act ("IEEPA"); and money laundering offenses.  The Criminal Investigation further involves aspects subject to protections against premature disclosure, and which are not undertaken jointly with the CFTC.  If requested, the Government is prepared to provide the Court with details of that ongoing investigative work on an *ex parte* basis.  *See* FED. R. CRIM. P. 6(e)(5) ("Subject to any right to an open hearing in a contempt proceeding, the court must close any hearing to the extent necessary to prevent disclosure of matters occurring before a grand jury."); FED. R. CRIM. P. 6(e)(6) ("Records, orders and subpoenas relating to grand jury proceedings must be kept under seal to the extent and as long as necessary to prevent the unauthorized disclosure of a matter occurring before a grand jury."); *see also Doe No. 4 v. Doe No. 1* (In re Grand Jury Subpoena), 103 F.3d 234, 239 (2d Cir. 1996) ("The law of this circuit is clear that, once a proceeding falls under Rule 6(e), it receives a presumption of secrecy and closure."); *United States v. Haller*, 837 F.2d 84, 87-88 (2d Cir. 1988) ("'[T]he proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings.'" (quoting *Douglas Oil Co. v. Petrol Stops N.W.*, 441 U.S. 211, 218 (1979)).

While granting the USAO access to certain materials, the CFTC has maintained separate control over its parallel investigative file, including by conditioning or refusing certain USAO access requests.  For example, in September 2019, the USAO made a written request for documents that the CFTC had obtained through foreign regulators.  The CFTC refused on the basis of the memoranda of understanding between those regulators and the CFTC.  Similarly, in November 2019, the USAO requested access to trading data produced by BitMEX to the CFTC.  Citing trade secret and confidentiality concerns raised by BitMEX when it produced that trading data to the

6

CFTC, the CFTC declined to re-produce to the data to the USAO. ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

████████. In October 2019, in preparation for in-person meetings with Witness-1, the USAO requested access to the CFTC's notes of its CFTC's prior discussions with Witness-1. The CFTC declined, citing its work product interest in those materials.

In February 2020, the USAO spoke by telephone with CFTC regulatory attorneys in Washington, D.C.—who were not members of the CFTC's Chicago enforcement/investigative team—concerning specific CFTC regulations implementing the CEA. Attorneys on the CFTC's enforcement/investigative team also dialed into the call but did not ask questions or direct the discussion.

With respect to witness interviews, with the exception of two days of substantive interviews of Witness-1, the agencies acted independently: the USAO did not join the CFTC's witness interviews, and the CFTC did not join the USAO's witness interviews. The exception was two days of interviews of Witness-1 in New York in November 2019. One CFTC attorney attended these interviews in-person, and an additional CFTC attorney participated by telephone. Representatives of both the USAO and the CFTC (and the FBI) asked questions during those two days of interviews, but only the FBI took notes. The FBI's notes have been produced to the defense. The CFTC has represented to the USAO that, in addition to not taking contemporaneous

7

notes of these interviews, the CFTC did not create subsequent notes or memoranda of the interviews.

Other than the foregoing Witness-1 interviews, the USAO conducted all of its witness interviews independently from the CFTC. As described above, the USAO understands that the CFTC likewise engaged with additional witnesses without the USAO's involvement (or knowledge). As to Witness-1, after two days of interviews where representatives of both agencies were present, the USAO independently interviewed Witness-1 for an additional two days, without the CFTC's involvement. In early 2020, the USAO/FBI again met with Witness-1 for two days of in-person interviews, without the CFTC present. The USAO and the FBI have also been in contact with Witness-1 by phone on multiple occasions, without the involvement of the CFTC. The FBI's notes and memoranda of discussions with Witness-1, and copies of the FBI's correspondence with Witness-1, have been produced to the defense in discovery.

As noted above, during the CFTC Investigation, the CFTC used its investigative subpoena power and other CFTC process to obtain a number of relevant documents (which, to the extent the USAO has obtained pursuant to the access letter, have been produced to the defense). The USAO also obtained documents, at times, by issuing grand jury subpoenas and by executing judicially authorized search warrants or other legal process. The USAO has complied with its obligations for grand jury secrecy under Federal Rule of Criminal Procedure 6(e), and has not shared with the CFTC any documents obtained by issuing grand jury subpoenas or any record of any testimony before the grand jury. The USAO has also not shared the documents obtained pursuant to search warrants or other court orders with the CFTC, including search warrants for Witness-1's electronic devices (discussed in further detail below) as well as email and other online accounts for Hayes, Reed, and suspected U.S. users of BitMEX.

8

Throughout the parallel investigations, the USAO and the CFTC each undertook an independent process to determine which defendants to charge or sue, respectively, and which legal violations to allege. At times, the agencies updated each other on their respective investigations, and whether and when each agency expected to be in a position to bring charges or file suit.

Also during the parallel investigations, counsel for certain individuals and entities made factual presentations and/or engaged in pre-charging discussions with one or both agencies. For example, counsel for BitMEX and Hayes made multiple presentations to the USAO. The CFTC did not participate in any of these presentations. Additionally, the USAO understands that the CFTC engaged in separate pre-charge conversations with counsel for BitMEX, Hayes, Delo, and Reed. The USAO did not participate in those conversations. At the USAO's request, the CFTC provided the USAO with copies of *Wells* submissions made by BitMEX (as well as a submission made by Hayes, Delo, and Reed, which the Government had not originally requested), and a copy of a presentation made by counsel for BitMEX to the CFTC, as well as a BitMEX corporate privilege log. The USAO has produced all of these materials to the defense in discovery. The USAO requested these materials at a time when BitMEX was purportedly attempting to cooperate in this case (which it has been doing from in or about July 2019 through the present).

Prior to charging, the USAO and the CFTC notified each other which defendants each anticipated charging or suing, and for what violative conduct. Neither the USAO nor the CFTC asked the other to bring a particular charge (or not to do so), or to charge or sue a particular defendant (or not to do so).

On October 1, 2020, the USAO unsealed its indictment and the CFTC filed its civil enforcement action. The CFTC did not participate in the USAO's presentation of the indictment of the grand jury, and neither agency reviewed drafts of the other agency's charging instrument or

internal memoranda discussing their proposed charges. The agencies coordinated the timing of their respective charges because, among other reasons, early notification of the CFTC's civil enforcement action could have jeopardized the USAO's efforts to locate the defendants and obtain their appearance in this criminal case, particularly given that three of the defendants (Hayes, Delo, and Dwyer) were then located outside of the United States. The CFTC has not accompanied the USAO to any of the (remote) court proceedings in this matter.

The USAO has produced to the defendants all documents it has received to date from the CFTC. In addition, in light of the defendant's current discovery requests and although it has no legal obligation to do so (as discussed herein), the USAO in June 2021 made renewed requests from the CFTC for access to: (1) any documents obtained from third parties (including, in an abundance of caution and to avoid missing any materials, documents that have already been produced to the USAO); and (2) the CFTC's notes or memoranda of witness interviews, including CFTC interviews of Witness-1 and any other witnesses. The CFTC has not agreed to give the Government access to its complete case file and has asserted work product and privilege protections over internal materials such as the CFTC's internal deliberative documents. The CFTC has, however, agreed to voluntarily provide additional materials to the USAO, subject to certain limited exceptions, including but not limited to materials covered by work product and privilege protections, and materials obtained from foreign regulators which the CFTC may be prohibited from sharing by the applicable memoranda of understanding between the CFTC and the foreign regulators. To the extent that the CFTC produces any of the foregoing additional materials to the USAO, and consistent with the law, the USAO will promptly review those materials and re-produce them to the defendants as required by the Government's Rule 16, *Brady*, and *Giglio* obligations.

### C.  The Witness-1 Devices

As described above, the USAO conducted four days of in-person interviews of Witness-1 in November 2019 (with the CFTC participating in the first two days of those interviews).  During those interviews, which spanned November 14 to November 17, 2019,  Witness-1 provided or agreed to provide the USAO with three electronic devices that he stated contained relevant information: two cellphones that Witness-1 had brought with him to the interviews (the "iPhone 6s" and the "iPhone 11," respectively), and an external hard drive that was at the time in the possession of a relative of Witness-1 (the "Hard Drive," together with the iPhone 6s and the iPhone 11, the "Witness-1 Devices").

Specifically, during his interview on November 14, 2019, Witness-1 stated in substance and in part that he had an old iPhone 6s with him; that he had used the iPhone 6s while an employee of BitMEX; and that the iPhone 6s had contained snapshots that had since been deleted showing relevant conversations with defendant Greg Dwyer.  That same day, Witness-1 further stated in substance and in part that when he left his employment at BitMEX, he copied his laptop, which he had used to perform his work at BitMEX, to the Hard Drive.  Witness-1 continued to explain, in substance and in part, that in the weeks prior to meeting with the USAO in November 2019, he had received a letter from BitMEX's counsel which he believed threatened him with potential legal action if he continued to possess BitMEX data, which he believed included the data on the Hard Drive, and as a result, he mailed the Hard Drive to a relative in a country different from where Witness-1 resided.  Witness-1 further told the Government in substance and in part that the day before meeting with the USAO, namely on November 13, 2019, he had instructed his relative to destroy the Hard Drive.  When meeting with the USAO on November 14, 2019, Witness-1 agreed to have his relative mail the Hard Drive to the FBI, and informed the Government after speaking to his relative that the connectors to the Hard Drive were broken (but the Hard Drive itself was

11

intact).

At some point on either November 14 or November 15, 2019, Witness-1 also disclosed that had a newer model cellphone with him—the iPhone 11.  Based on the USAO's understanding that Witness-1 used the same iCloud accounts on both the iPhone 6s and the iPhone 11, the USAO believed that data from the iPhone 6s (including possibly BitMEX-related data) may have been saved to the iPhone 11.

During his second day of in-person interviews on November 15, 2019, Witness-1 verbally consented to the Government reviewing certain information on the iPhone 6s.  He subsequently signed a consent form for a "limited search" of the iPhone 6s, to include "selected screenshots and other files identified by & copied in [Witness-1's] presence."  Based on that consent, the Government brought Witness-1 and his iPhone 6s to an Investigative Analyst who is employed by the USAO, and began to take electronic screenshots of data from the iPhone 6s that Witness-1 identified as relevant and authorized the Government to obtain.  Upon further discussion, and due primarily to the fact that the screenshotting process just described was time-consuming and cumbersome, Witness-1 signed a different consent form allowing the Government to conduct a full search of his iPhone 6s as well as the iPhone 11.  Through the consent form Witness-1, *inter alia*, "relinquish[ed] any constitutional right to privacy" in the iPhone 6s and iPhone 11, "authorized the United States Attorney's Office, for the Southern District of New York to search to make and keep a copy of any information stored of these devices," and that he would have no "privacy or possessory interest" in the copy.  (Witness-1 Device Mot., Ex. 7.)  Based on that consent, the USAO created forensic images of both the iPhone 6s and iPhone 11.  Both cellphones were returned to Witness-1 that same day.

On November 17, 2019, before the USAO and FBI had begun reviewing the forensic

12

images of the iPhone 6s and the iPhone 11, Witness-1 verbally revoked part of his prior consent, stating in substance and in part that he did not want law enforcement to look at his emails or WhatsApp messages that were contained on the cellphones.

On December 4, 2019, the FBI received the Hard Drive, which Witness-1 had arranged to deliver by mail. Because of Witness-1's revocation of consent as to the cellphones, in an abundance of caution, the Government sought and obtained a search and seizure warrant that authorized it to search the entirety of the forensic images it had created of the iPhone 6s and the iPhone 11, and the Hard Drive. (Witness-1 Device Mot., Ex. 12, the "Witness-1 Device Warrant"). The Witness-1 Device Warrant authorized the USAO and FBI to search the forensic images of the iPhone 6s and iPhone 11, and to search the Hard Drive, for specific materials described in Attachment A to that warrant.[3]

The Government began to search the Witness-1 Devices beginning in January 2020. Before engaging in a full substantive review, on February 10, 2020, the FBI case agents asked Witness-1 to provide identifying information regarding potential privileges on Witness-1's devices. Specifically, the FBI case agents obtained from Witness-1 a list of names and email addresses belonging to his spouse, his personal attorneys, and BitMEX corporate attorneys. When the USAO and the FBI engaged the Filter Team to identify potentially privileged material and to segregate those items from the Witness-1 Devices, the FBI case agents provided these privilege identifiers to the Filter Team.

Based on its review of the iPhone 6s, the Filter Team identified and segregated communications between Witness-1 and his spouse which were potentially protected by spousal

---

[3] The FBI did not commence its search of the Devices within fourteen days, so the Government obtained an updated warrant on or about January 3, 2020, which included precisely the same Attachment A.

13

privilege, as well as documents which potentially implicated BitMEX's corporate attorney-client privilege. The Filter Team did not identify any information on the iPhone 6s as being potentially protected by Witness-1's personal attorney-client privilege. The Investigative Team also subsequently learned that, when the iPhone 6s was imaged by the USAO, no emails or WhatsApp messages—the two categories of data for which Witness-1 had sought to revoke his consent to search—had been recovered from the phone.

With respect to the Hard Drive, the Filter Team performed its review prior to releasing its contents to the Investigative Team. The Filter Team identified and segregated documents on the Hard Drive that potentially implicated BitMEX's corporate attorney-client privilege. The Filter Team did not identify or segregate any data on the Hard Drive as being potentially protected by Witness-1's spousal privilege or personal attorney-client privilege.

As to the iPhone 11, neither the Filter Team nor the Investigative Team were able to review the forensic image of that cellphone. Specifically, the data from the iPhone 11 was extracted to a Government laptop. The hard drive on this laptop failed before the FBI had been given a copy of the extraction or the extraction had been backed up. An FBI technician attempted to extract the data, but could not, either because the drive failed or because it was faulty. Accordingly, the Government is not capable of reviewing the data for the iPhone 11 (and for other devices from separate investigations that had been copied to the hard drive).

The Government has produced to the defendants in discovery the material from the iPhone 6s that is responsive to the Witness-1 Device Warrant. In an abundance of caution, given Witness-1's consent to search data other than WhatsApp and email messages from the device (categories of data which, as noted above, were not recovered), the Government is undertaking an additional review of the iPhone 6s to identify any additional materials potentially connected to BitMEX or

14

the defendants, or that could be used to cross-examine Witness-1 or any other potential Government witness, even if such evidence is beyond the scope of the Witness-1 Device Warrant, and has or will soon produce such materials to the defense. The Government is producing only the discoverable portions of the iPhone 6s to the defense, rather than the entirety of the phone, because in addition to not being legally required under Rule 16, *Brady*, or *Giglio*, the phone contains, among other things, personal information and photographs belonging to Witness-1 that Witness-1 has requested not be released, and communications subject to Witness-1's spousal privilege.

The Government will also be producing all materials from the Hard Drive that the FBI has deemed responsive to the Witness-1 Device Warrant, as well as all BitMEX corporate data on the Hard Drive, and any Witness-1 personal data that the Government determines is discoverable as Rule 16, *Brady* or *Giglio*. As noted above, the Government conducted its review of the Hard Drive pursuant to the Witness-1 Device Warrant. The Government will produce the portions of the Hard Drive that it deems responsive to the Witness-1 Device Warrant. In addition, the Government has sought and obtained consent from both Witness-1—who provided the Hard Drive to the FBI—and BitMEX—whose data appears on the drive—to produce additional materials to the defense. Though BitMEX has refused to consent to the Government reviewing the contents of the Hard Drive, it has consented to the Government producing the entire Hard Drive to the defense. Witness-1 has consented to disclosure of any BitMEX data on the Hard Drive. The Government is engaging with Witness-1's counsel to identify any information on the Hard Drive that Witness-1 asserts is personal to Witness-1. After Witness-1 identifies any such information, the Government will produce the remaining (non-personal) data on the Hard Drive to the defense, including materials that the Government deemed non-responsive to the Witness-1 Device Warrant

15

and that the Filter Team segregated from the Investigative Team as potentially subject to BitMEX's corporate attorney-client privilege. With respect to any personal data identified by Witness-1 on the Hard Drive, the Government will review that data consistent with its Rule 16, *Brady*, and *Giglio* obligations and will disclose to the defense any discoverable portions of those materials.

Because the Government is unable to access the forensic image of the iPhone 11, the Government has no materials capable of production and has produced no material from the iPhone 11.

**LEGAL STANDARDS**

### A. *Brady & Giglio*

The Government has an obligation under the Due Process Clause to make a timely disclosure of any exculpatory or impeaching evidence that is material and in its possession. *See Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972); *see also United States v. Coppa*, 267 F.3d 132, 139-40 (2d Cir. 2001). Evidence is "material" in this sense only if "its suppression undermines confidence in the outcome of a trial." *United States v. Bagley*, 473 U.S. 667, 678 (1985). "The rationale underlying *Brady* is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government.'" *United States v. LeRoy*, 687 F.2d 610, 619 (2d Cir. 1982) (citing *United States v. Ruggiero*, 472 F.2d 599, 604 (2d Cir.), *cert. denied*, 412 U.S. 939 (1973)).

Impeachment evidence has been found to be material only "where the witness at issue supplied the only evidence linking the defendant(s) to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case." *United States v. Payne*, 63 F.3d 1200, 1210 (2d Cir. 1995) (internal quotation marks and citations omitted).

16

Similarly, "where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or is subject to extensive attack by reason of other evidence, the undisclosed evidence may properly be viewed as cumulative, and hence not material." *United States v. Persico*, 645 F.3d 85, 111 (2d Cir. 2011) (citing cases).

There is no fixed formula for the content of a *Brady* disclosure. Such a disclosure need only apprise a defendant "'of the essential facts permitting him to take advantage of any exculpatory evidence.'" *United States v. Zackson*, 6 F.3d 911, 918 (2d Cir. 1993) (quoting *LeRoy*, 687 F.2d at 618). Specifically with respect to witness statements, "[t]he government is not required to make a witness' statement known to a defendant who is on notice of the essential facts which would enable him to call the witness and thus take advantage of any exculpatory testimony that he might furnish." *United States v. Stewart*, 513 F.2d 957, 960 (2d Cir. 1975).

"With respect to when the prosecution must make a disclosure required by *Brady . . . Brady* material must be disclosed in time for its effective use at trial or at a plea proceeding." *United States v. Douglas*, 525 F.3d 225, 245 (2d Cir. 2008) (*quoting Coppa*, 267 F.3d at 135) (emphasis in original).

Courts in this Circuit routinely deny specific requests for *Brady* material where the Government has made a good-faith representation to the court and the defense counsel that it recognizes and has complied with its disclosure obligations under Brady. *See, e.g.*, *United States v. Zelaya-Romero*, No. 15 CR. 174 (LGS), 2018 WL 1033235, at *3 (S.D.N.Y. Feb. 21, 2018) (Government assurances that it "'is aware of its obligations under Rule 16, *Brady*, and *Giglio*, is currently in compliance with those obligations, and will remain in compliance with those obligations in the future,' are sufficient"); *United States v. Rivera*, 16 Cr. 175 (LGS), 2017 WL

17

1843302, at \*2 (S.D.N.Y. May 8, 2017) (denying defendants' motions to disclose Brady material after "the Government represented that it does not have any [Brady material], is not aware of any, and will 'promptly' produce any of which it becomes aware"); *United States v. Gallo*, 98 Cr. 338, 1999 WL 9848, at \*8 (S.D.N.Y. Jan. 11, 1999) (denying defendant's motion to compel production of purported Brady material based on Government's representations that "it is aware of its obligations under Brady . . . and will produce any Brady material to the defense well before trial"); *United States v. Yu*, 97 Cr. 102 (SJ), 1998 WL 57079, at \*4–\*5 (E.D.N.Y. Feb. 5, 1998) (denying defense request that Government provide early disclosure of Brady material because Government acknowledged its continuing obligation to provide exculpatory material upon its discovery and assured that it would comply with that obligation); *United States v. Perez*, 940 F. Supp. 540, 553 (S.D.N.Y. 1996) (same).

## B.  Rule 16

Rule 16 of the Federal Rules of Criminal Procedure requires the Government to permit the defendant to inspect and copy documents and objects within the Government's possession, custody, or control if the items are material to preparing the defense, if the Government intends to use them in its case-in-chief at trial, or if the items were obtained from or belong to the defendant. FED. R. CRIM. P. 16(a)(1)(E).

An item is "material to preparing the defense" under Rule 16 "if it could be used to counter the Government's case or bolster a defense."  *United States v. Stevens*, 985 F.2d 1175, 1180-81 (2d Cir. 1993).  In other words, the question is whether the evidence will enable a defendant "'significantly to alter the quantum of proof in his favor.'"  *United States v. Urena*, 989 F. Supp. 2d 253, 261 (S.D.N.Y. 2013) (quoting *United States v. Maniktala*, 934 F. 2d 25, 28 (2d Cir. 1991)). A defendant seeking an order compelling Rule 16 discovery "must make a *prima facie* showing of

18

materiality, and must offer more than the conclusory allegation that the requested evidence is material." *Id.* (internal citations and quotations omitted).

### C. Joint and Parallel Investigations

A prosecutor's duty to review files for *Brady* material extends to reviewing information in the possession, custody, or control of another agency only where the Government conducts a "joint investigation" with that agency. *United States v. Rigas*, No. 02 Cr. 1236 (LBS), 2008 WL 144824, at *2 (S.D.N.Y. Jan. 15, 2008), *aff'd*, *United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009) (holding that there was "no joint investigation with the SEC" and therefore the Government did not need to produce documents in the custody of the SEC); *United States v. Finnerty*, 411 F. Supp. 2d 428, 433 (S.D.N.Y. 2006) (Chin, J.) (holding that the Government and the NYSE, even if it were a state actor, did not conduct a joint investigation related to the policies of the NYSE).

Parallel investigations, in which civil regulators (such as the CFTC and the SEC) and the Government share information and conduct joint witness interviews, support the "[e]ffective enforcement" of securities and commodities laws. *See, e.g.*, *S.E.C.* v. *Dresser Industries*, Inc., 628 F.2d 1368, 1377 (D.C. Cir. 1980) (en banc) ("If the SEC suspects that a company has violated the securities laws, it must be able to respond quickly: it must be able to obtain relevant information concerning the alleged violation and to seek prompt judicial redress if necessary. Similarly, Justice must act quickly if it suspects that the laws have been broken. Grand jury investigations take time, as do criminal prosecutions.").

Although the Second Circuit has not spoken directly to the question, the majority of district courts have concluded that, standing alone, joint fact gathering is not sufficient to trigger an

extension of the Government's *Brady* obligations.[4]  Instead, "[a] number of factors are relevant in determining whether the prosecution conducted a 'joint investigation,' including whether the other agency: (1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings."  *United States v. Middendorf*, 18 Cr. 36 (JPO), 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018) (citing *United States v. Blaszczak*, 308 F. Supp. 3d 736, 741-42 (S.D.N.Y. 2018)); *see also United States v. Collins*, 409 F. Supp. 3d 228, 241 (S.D.N.Y. 2019) (finding no joint investigation where SEC and Government participated in some joint interviews); *United States v. Chow*, No. 17 Cr. 667 (GHW), ECF No. 69, at 87 (S.D.N.Y. Feb. 9, 2018) (finding no joint investigation where agencies shared information but made their own determinations regarding what documents to obtain and what facts to ask a witness); *accord S.E.C. v. Stanard*, No. 06 Civ. 7736 (GEL), 2007 WL 1834709, at *3 (S.D.N.Y. June 26, 2007) (FBI and SEC did not conduct a joint investigation despite participating in joint interviews during which only FBI took notes); *Rigas*, 2008 WL 144824, at *2 (finding that parallel civil and criminal investigations were not "joint").  Asking the Government to review the entire investigative file of a parallel investigating agency merely because the agencies sought to maximize the efficiencies of

---

[4] In two cases, judges in this District have concluded that certain types of joint fact gathering may trigger a limited obligation on the Government to review the files of another agency.  In *United States v. Gupta*, 848 F. Supp. 2d 491 (S.D.N.Y. 2012), Judge Rakoff ordered the Government to review for *Brady* SEC documents memorializing witness interviews that were conducted jointly by the SEC and the Government.  In so doing, however, Judge Rakoff made clear that his finding did "not mean that all of the documents the SEC prepared and accumulated in its investigation are part of the joint investigation" such that they would need to be reviewed for *Brady*.  *Id*. at 495.  In *United States v. Martoma*, 990 F. Supp. 2d 458 (S.D.N.Y. 2014), Judge Gardephe ordered the Government to review a narrow subset of SEC memoranda relating to cooperating witnesses.  *Id*. at 462.  In neither case did the court conclude that joint fact gathering would give rise to an obligation by the Government to review the SEC's entire investigative file.

investigation would "inappropriately require [the Court] to adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'" *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998).

## ARGUMENT

### A. The Motion to Compel Review and Disclosure of the CFTC's Complete File in a Parallel Investigation Should be Denied.

The defendants request that the Government be compelled to search, for possible *Brady* and Rule 16 materials, the complete files of the CFTC. This request would require the Government to obtain documents that were collected by the CFTC as part of its parallel investigation and that are in the exclusive possession, custody, and control of the CFTC. This broad and overreaching request is premised on the assumption that the parallel investigations conducted by the Government and the CFTC were, instead, one joint investigation. That assumption is incorrect.

As a preliminary matter, although it is under no legal obligation to gather any additional materials from the CFTC, for the reasons explained below, the Government has requested the CFTC to identify and produce to the USAO witness statements and any third-party productions in its investigative file that have not already been provided to the USAO. Based on conversations with the CFTC in anticipation of this response, the Government understands that the CFTC will provide the USAO with the other third-party document productions and witness statements. Once the CFTC provides those materials, the USAO will promptly review those materials and produce such materials, consistent with the law and pursuant to Rule 16, *Brady*, and *Giglio*.[5]

---

[5] The Government's requests to the CFTC belie the defendants' repeated assertions that the Government is in some way acting inconsistently with the Justice Manual. The Government has taken a broad view of materiality, and has now taken further steps to obtain and subsequently review and produce information from an entirely independent investigating agency, with whom the Government was not joint.

Turning to the merits of the CFTC Motion, the weight of all the relevant factors establishes that the USAO and CFTC investigations were parallel, not joint.  To begin with, although the USAO and the CFTC both attended two days of interviews of a single witness, the USAO and the FBI otherwise conducted all of the witness interviews in the Criminal Investigation independently, without the CFTC's involvement—including by conducting four additional days of in-person interviews of Witness-1.  The USAO has not shared the notes and reports of the Witness-1 interviews, or its remaining witness interviews, with the CFTC.  Even as to Witness-1, the CFTC did not take contemporaneous notes during the two days of interviews in which it participated. The CFTC has further represented to the USAO that it did not subsequently memorialize those interviews in notes or memoranda.  The CFTC has also independently obtained information from and interviewed numerous witnesses other than Witness-1 without the USAO's involvement or knowledge.

These facts easily distinguish this case from the *Gupta* and *Martoma* decisions relied upon so heavily by the defense.  *See United States v. Gupta*, 848 F. Supp. 2d 491, 493-94 (S.D.N.Y. 2012) (finding joint fact-gathering as to 44 witness interviews where "bulk of witness interviews were jointly conducted," and where "within a day or two after each interview, [the SEC] prepared memoranda that summarized" those interviews in "frequent[] consult[ation] with the AUSAs"); *United States v. Martoma*, 990 F. Supp. 2d 458, 461 (S.D.N.Y. 2014) (finding joint investigation where,  among other facts, the USAO and SEC conducted twenty joint interviews).[6]

---

[6] Even assuming the logic of *Gupta* and *Martoma* actually applied here, which it does not, the CFTC's participation in these Witness-1 interviews with the USAO would only create an obligation for the Government to review CFTC notes of those interviews for *Brady* evidence—not the CFTC's entire case file.  *See Gupta*, 848 F. Supp. 2d at 495 (requiring Government to review notes taken by SEC in context of joint investigation, but holding that "[t]his does not mean that all of the documents the SEC prepared and accumulated in its investigation are part of the joint

Furthermore, the fact that the USAO and the CFTC coordinated limited interviews with Witness-1 reflects only a typical and unsurprising degree of coordination that spared Witness-1 from traveling for multiple interviews in the United States.  Combining interviews thus promotes efficiency and reduces costs for all parties involved in an investigation.  In part for this reason, several judges in this District have held that such practices are indicative of parallel as opposed to joint investigations.  *See United States v. Goffer*, No. 10 Cr. 56 (RJS), ECF No. 90 (S.D.N.Y. July 29, 2010) (Sullivan, J.); *Rigas*, 2008 WL 144824, at *2; *Stanard*, 2007 WL 1834709, at *3.

The balance of the relevant factors likewise evidence that the investigations were parallel.  As Judge Kaplan explained in *Blaszczak*, where the agencies conducted substantially more joint witness interviews than in this case:

> Although [the SEC] interviewed witnesses and gathered facts alongside the USAO, it was not present at some prosecution contacts and interviews, did not review documents gathered only by the prosecution, and did not 'develop[] prosecutorial strategy.' Representatives of the SEC have not accompanied the USAO to court proceedings in this case. Neither the Commission nor the USAO recommended action to the other or had any role in the other's decision making process. The USAO has not even seen the SEC's action memorandum.

308 F. Supp. 3d at 742 (quoting *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006)); *see Middendorf*, 2018 WL 3956494, at *5 (relying on the *Blaszczak* factors and finding no joint investigation where "the SEC was not involved in [the Government's] grand jury presentation, has not reviewed documents gathered by the Government or shared the fruits of its investigation with the Government, and did not participate in the overall development of prosecutorial strategy. And

---

investigation").  As the CFTC did not take notes during or after those interviews, and the FBI's notes and memoranda of these meetings have already been produced to the defense, the Government has already satisfied any such obligation which might exist, and so the defendants' motion is moot.

23

beyond conducting joint interviews, the Government and SEC have not coordinated their separate fact-finding efforts").

In this case, the USAO and the CFTC made independent decisions about what charges/claims they intended to bring and which defendants they would charge/sue.  Indeed, the criminal and civil cases were brought against different sets of parties—with the CFTC alone charging the corporate BitMEX entities, and the USAO alone charging defendant Dwyer.  Further, while the CFTC alleged civil regulatory violations from November 2014 onward, the USAO has alleged criminal violations for a narrower time period, from September 2015 through September 2020.  The investigative teams at the USAO and the CFTC made these charging decisions independently, based on their own assessments of the applicable laws and facts.  Indeed, when the USAO sought information about the rules and regulations that the CFTC enforces, the USAO consulted not with the CFTC investigative team but with regulatory attorneys within the agency with relevant expertise in the agency's application of the relevant regulations.  The CFTC also played no role in the USAO's grand jury presentation, and has not accompanied the USAO to remote court proceedings in this matter.

Nor did the USAO or the CFTC direct one another to take any particular investigative actions.  Instead, each agency took the appropriate respective prosecutorial and regulatory enforcement action it deemed necessary.  For example, the USAO independently obtained search warrants and other court orders to access electronic data, while the FBI engaged in an undercover operation evidencing how easily BitMEX can be accessed and used by customers located in the United States.

Put simply, the USAO and the CFTC did not conduct a joint investigation. In arguing to the contrary, the defendants make a number of arguments that stretch any commonsense understanding of a "joint" undertaking.

First, in claiming that the USAO and the CFTC engaged in joint fact-gathering—a finding at the heart of the rationale in *Gupta* and *Martoma*, the only cases in this district of their kind— the defense relies heavily on the fact that the Criminal Investigation was the result of a criminal referral by the CFTC; ███████████████████████████████ and that the CFTC shared a large volume of materials from its investigative file with the USAO. (CFTC Mot. at 15-16.) In the absence of jointly conducted investigative efforts, with perhaps the limited exception of two days of interviews of Witness-1, the defendants suggest that these facts somehow transform the parallel investigations into a joint endeavor. Such an outcome defies logic and would undermine significant policy considerations. ████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████ In evaluating investigations ██████████████████████████████ the CFTC and the SEC will at times determine to refer the matter for a criminal investigation, including by notifying criminal authorities of the matter under investigation and by providing a prosecutor's office with access to all or a portion of their factual investigative file. The public interest is greatly served by such referrals. None of these actions makes the CFTC or the SEC—or Witness-1, for that matter— an "arm" of the prosecution or a member of the prosecution team. To hold otherwise would significantly undermine the public interest in criminal referrals by the CFTC and the SEC,

independent agencies which—under the rationale urged by the defense—would open their entire agencies' files up to criminal discovery whenever they make a criminal referral and share independently gathered information ███████████████████████ with the Government.[7]

The defendants' remaining fact-gathering arguments are likewise meritless. For example, the defendants argue that the USAO's collection of evidence through search warrants, an FBI undercover investigation, and grand jury subpoenas are indicative of a joint investigation because the USAO cited or was informed by information obtained in Witness-1 interviews or from the CFTC's pre-existing investigative file. (CFTC Mot. at 17). To be clear: the USAO and the FBI engaged in each of these fact-finding efforts independently, without any involvement by the CFTC. The USAO and the FBI independently reviewed the materials it received from the CFTC, determined what facts should be newly investigated in support of the Criminal Investigation, and decided if additional information should be sought from third parties who had already supplied information in response to CFTC requests. The USAO alone determined what legal process to seek and drafted its own search warrants, supporting affidavits, and subpoenas, which were not shared with or reviewed by the CFTC. The USAO and the FBI alone have reviewed the fruits of these investigative efforts, including data obtained pursuant to search warrants and grand jury subpoenas, none of which have been provided to the CFTC. To characterize these independent fact-finding efforts as part of a joint investigation or as evidence of a coordinated prosecution strategy merely because they were informed by Witness-1—a fact witness—and by the CFTC's

---

[7] The Government has repeatedly stated that it intends to provide, and is in fact providing, with "open-file or near-open file discovery." (CFTC Mot. at 10; CFTC Mot. Ex. 25). That is why the Government has produced statements of potential witnesses, even those the USAO has no intention to call at trial, months before a trial date was even set. But "open-file" means only those files in the possession of the Government's and the investigating agency. It does not mean all files anywhere and everywhere including outside such possession.

independent fact-gathering is inconsistent with even the most generous interpretation of the caselaw cited by the defense. *See, e.g.*, *Gupta*, 848 F. Supp. 2d at 495 (noting that, even where USAO-SEC investigations were "joint" as to jointly conducted witness interviews, "[t]his does not mean all the documents the SEC prepared and accumulated in its investigation . . . are part of the joint investigation," such that the Government's *Brady* obligations extended only to SEC "documents arising from those joint efforts").

With respect to BitMEX, the defendants also note that the USAO sought and obtained documents from the CFTC evidencing what arguments and claims were made by BitMEX and its founders/owners (Hayes, Delo, and Reed) to the CFTC, including *Wells* briefing and a presentation to the CFTC. (CFTC Mot. at 15). The USAO did not task the CFTC with obtaining this information, which the Government understands is routinely gathered during CFTC investigations (and which were provided to the CFTC at a time when the existence of the Criminal Investigation was known to BitMEX). The Government also did not participate in any presentations made by BitMEX or the defendants to the CFTC. Just as with obtaining factual information from the CFTC, obtaining representations made by a company to its regulator is entirely appropriate in parallel investigations and does not make those efforts joint. It is likewise routine and entirely appropriate for the Government to learn what arguments a company under parallel criminal and regulatory investigations is making to its regulator, if only to ensure that the company is not making inconsistent arguments to those authorities. Such a request was particularly necessary to the independent Criminal Investigation here, where the defendants and their company were making representations to the CFTC during the course of the charged criminal conduct, which as alleged in the Indictment continued for nearly two years after the company was first served with a CFTC subpoena. Finally, the fact that the Government recently urged BitMEX to disclose an inculpatory

27

document to the CFTC—a request that defendants claim evidences a joint investigation (CFTC Mot. at 8)—is yet further proof that the USAO is not acting jointly with the CFTC in its investigation. If the agencies were indeed joint, the USAO would have simply provided the inculpatory document to the CFTC directly. Instead, in the context of BitMEX's purported cooperation with the Criminal Investigation, the USAO expressed its expectation that BitMEX would disclose the inculpatory document to its regulator. The issue identified by the defendants here is one of corporate cooperation, not a joint investigation—the USAO is appropriately concerned that a nominally cooperative corporation be fully transparent with its regulators about the conduct under investigation.

The defendants also point to the factual and legal overlap in the cases ultimately brought by the USAO and the CFTC (which the Government cited in its motion to stay the civil CFTC action) as evidence of a joint investigation, and in particular to support their claim that the CFTC directed the USAO's prosecution strategy. (CFTC Mot. at 17-18). It is trivially true that when parallel civil and criminal agencies investigate corporate wrongdoing that the witnesses to that conduct will have evidence relevant to both investigations. It is also trivially true that when describing undisputed and undisputable facts about the same company and its executives, charging instruments drafted entirely independently by two different agencies may have similarities. Such similarities say nothing about how the agencies conducted their prosecutions.[8] Here, for example, the defendants argue that the manner in which the Indictment and the CFTC complaint describe BitMEX's operations and the roles of the defendants—facts that are advertised online—is somehow evidence of a coordinated prosecution. (CFTC Mot. at 3–4) (comparing paragraphs of

---

[8] Likewise, the press releases put out by the USAO and CFTC thanking the opposite agency say nothing about how the agency and the Government conducted each underlying investigation.

28

the USAO indictment and CFTC complaint that, among other things, describe the defendants as the owners and founders of BitMEX, and allege that Hayes was BitMEX's CEO, Delo was BitMEX's COO, and Reed was BitMEX's CTO). This claim is laughable. The question is not whether the USAO relies on the same core witnesses or the same core facts as the CFTC but whether the agencies conducted their investigations or prosecutions jointly. As explained throughout, they did not. In reaching the opposite conclusion, the defendants ignore numerous hallmarks of independent charging decisions between the agencies, including most obviously that the agencies charged different parties, for different periods of time, based on different legal theories.

For all the reasons set forth above, the USAO and the CFTC investigations were parallel, and the CFTC cannot be viewed as an "arm" of the prosecution or a member of the prosecution team. As such, the USAO's *Brady* and Rule 16 obligations do not extend to materials in the CFTC's sole custody, control, and possession.

Even if the USAO had an obligation to review all or a portion of the CFTC's independent case file, the purported *Brady* materials identified by the defense include information that—even if it existed—would not be exculpatory. Here, the defendants seek "any evidence that the CFTC believed that the application of the CEA to BitMEX was questionable or debatable," including but not limited to "notes and memoranda regarding meetings between CFTC personnel and any defendant or HDR Representative or any third party regarding BitMEX." (CFTC Mot. at 21.) The defendants cite no factual basis to believe that any such materials exist. To the extent that defendants' speculative and vague request seeks the CFTC's internal deliberative memoranda, including the deliberations of the CFTC enforcement staff in bringing its civil action, or regulatory staff discussing application of the CEA to BitMEX prior to the existence of the CFTC

29

Investigation, such discussions are quite simply not exculpatory.  Internal notes and memoranda of attorneys—whether at the CFTC or the USAO—have no independent evidentiary value and are not favorable to the defense.  *Facts*, not attorney opinions, must be disclosed pursuant to *Brady*.  *See, e.g.*, *United States v. Carroll*,  No. 19 Cr. 545 (CM), 2020 WL 1862446, at \*10 (S.D.N.Y. Apr. 14, 2020) (rejecting request for "potential memoranda outlining SEC attorneys' opinions at various points in the investigation concerning the strengths and weaknesses of its own case" which had not been shared with the Government because—even if the USAO and the SEC had investigated jointly—the "thoughts and impression of SEC staff" are not *Brady*).  Next, to the extent that the defendants suggest that the CFTC's belief about the application of the law was reflected in meetings between CFTC personnel and any defendant or HDR representative, that information is in the possession of the defense, who as the CFTC Motion makes clear are working in a joint defense posture and have complete access to BitMEX corporate information in the possession of the company and its counsel, including intimate details of its attempts to cooperate in the very Criminal Investigation in which the individual defendants have been charged.  Because the defendants know the identities of any individuals at the CFTC with whom they or corporate representatives met, and the substance of those communications are available to the defense, any such information is not *Brady*.  *See, e.g.*, *United States v. Gaggi*, 811 F.2d 47, 59 (2d Cir. 1987) ("no Brady violation occurs if the defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence.").  Finally, to the extent that the defendants speculate that the CFTC communicated its view of the law to any "third party," the defendants have not alleged that they learned of or acted in reliance on any such communication.  Absent this or a similar additional fact, even the CFTC's external communications would not be

*Brady* because unless the defendants knew of and relied on such information, it simply does not go to their mental state or to any other relevant fact in this case.

Based on all of the foregoing, the CFTC Motion should be denied. The defendants' request for an evidentiary hearing, which is supported by no authority, should likewise be denied.

### B. The Motion to Compel Production of the Witness-1 Devices Should Be Denied

The USAO has made voluminous productions to the defendants beyond the scope required by law at this stage of the case, and continues to produce materials subject to its disclosure obligations. Despite the extremely broad discovery they have already received, defendants now seek production of the Witness-1 Devices, in their entirety, without any legal basis. Moreover, their primary purpose in doing so appears to be obtaining non-exculpatory, non-impeaching personal data belonging to Witness-1, to which they are plainly not entitled.

When the USAO obtained the Witness-1 Devices, the Government needed to obtain a warrant to review any materials taken from BitMEX. (Witness-1 Device Mot. at 1 (stating that the Witness-1 Devices "contain BitMEX documents and data relevant to the charges that Witness-1 stole from the Company").) *See United States v. Bronfman*, No. 18CR2043NGGVMS, 2019 WL 1332888, at *6 (E.D.N.Y. Mar. 25, 2019) ("when a private party takes an individual's files and gives them to the Government without reviewing them, the Government typically needs a warrant to review the files") (citations omitted). The USAO did just that. (Witness-1 Device Mot. Ex. 12 (Witness-1 Device Warrant).) The USAO then completed a responsiveness review of the data on the iPhone 6s, and produced all evidence within the scope of its warrant. The USAO then went further, relying on Witness-1's prior consent to engage in a supplemental review to identify and soon produce materials potentially related to BitMEX or the defendants or that could be used to impeach Witness-1 at trial, even if beyond the scope of the information seized by the Government pursuant to Attachment A of the Witness-1 Device Warrant. The USAO has since

31

gone further again, obtaining Witness-1 and BitMEX's consent for production of all BitMEX corporate data from the Hard Drive to the defendants.[9]  As to materials on the Hard Drive that Witness-1 identifies as personal, the USAO and FBI will review the data for any discoverable materials and produce them to the defense.  But the defendants want more: they want not just the materials related to or belonging to BitMEX, or related to the Indictment, or that are exculpatory, or that are derogatory of Witness-1, but also the devices or their forensic image themselves, which contain personal information belonging to Witness-1, including materials protected by Witness-1's spousal privilege.  This request is ungrounded in Rule 16, *Brady*, *Giglio*, or the Jencks Act.[10]

The defendants misinterpret the plain language of Rule 16 to justify production of the Devices or their forensic images.  Rule 16 requires the Government to disclose an "item" if the "item is material to preparing the defense" or if "the government intends to use the item in its case-in-chief at trial."  FED. R. CRIM. P. 16(a)(1)(E)(i) and (ii).[11]  The Government has no intention of

---

[9] This latter production will include material that is technically outside the USAO's possession, since it will include all BitMEX data on the Hard Drive even if not responsive to the Witness-1 Device Warrant.  Such data will be available to the defendants *but not* the Government, whose "possession of and ability to review [the] data is necessarily circumscribed by the Fourth Amendment," and does not have "legal authority to go back and search materials that are non-responsive, i.e., outside the scope of the search warrant." *Collins*, 409 F. Supp. 3d at 244.

[10] With respect to the iPhone 11, the Government simply does not have access to its forensic image on the drive, because the USAO analyst and FBI technician have not been able to extract the data from the drive.  This image and associated data are thus not in the Government's "possession, custody, or control," and the defendants' motion with respect to that device is moot.  FED. R. CRIM. P. 16(a)(1)(E).

[11] The defendants also assert that they are entitled to the Devices because the information is "owned by the Defendants."  (Witness-1 Device Mot. at 15 (citing FED. R. CRIM. P. 16(a)(1)(E)(iii)).)  This argument is meritless as to the Devices, particularly the iPhone 6s.  First, none of the defendants are themselves the corporate entity, BitMEX, that might claim ownership of any BitMEX data that Witness-1 obtained.  Defendants offer no factual or legal reason to conclude that they can stand in the shoes of the separate corporate entity, the Company, to retrieve this data.  Second, while the Company owns *its* data on the Devices, it does not own the personal information or privileged communications belonging to Witness-1, particularly on his personal cellphone.  With respect to the Hard Drive, the Government will produce all BitMEX data to the

32

using the iPhone 6s or the Hard Drive themselves at trial. And the forensic images of the iPhone

6s and Hard Drive are not themselves material to preparing the defense. Instead, the forensic

images *contain* evidence and information that is material and that the Government may seek to

introduce at trial. Thus, the forensic images themselves are not "item[s]" subject to disclosure;

only the evidence and information stored on the forensic images are such "item[s]" subject to

disclosure. Despite their convenient and consistent misinterpretation of that plain language, the

defendants understand this distinction. They refer throughout their brief to the fact that the

"Witness-1 Devices *contain* BitMEX documents and data relevant to the charges that Witness-1

stole from the Company upon his resignation in 2018," and that "the Witness-1 Devices *contain*

information relating to Witness-1's motivations for stealing information from the Company and

providing information to the government." (Witness-1 Device Mot. at 1 (emphases added); *see*

*also id.* at 3 ("the iPhones apparently contain saved copies of these photographs"), 12 (the Devices

"contain information relating to the government's allegations . . . "), 16 ("the Witness-1 Devices

contain material information . . . ").) The Government agrees that the Defendants are entitled to

*that* information; that is why the Government has previously or will soon produce all such items

from the forensic images of the iPhone 6s and the Hard Drive. But there is no basis for disclosure

of the entirety of the forensic images of the iPhone 6s or Hard Drive under the plain language of

Rule 16.

The same is true with respect to *Brady*, *Giglio*, and the Jencks Act. The USAO has or will

produce to the defendants all information within its possession from the iPhone 6s that is relevant

---

defendants, and intends to withhold only information that Witness-1 identifies as personal and which the Government determines is not subject to disclosure under applicable law. Defendants have provided no evidence or law establishing that Witness-1 cannot claim ownership of personal documents saved to the Hard Drive.

to the charges in the Indictment or that could be used to cross-examine Witness-1 or any other potential Government witness. The USAO will also produce to the defendants all information from the Hard Drive, besides information that is deemed personal by Witness-1 and that is not otherwise subject to disclosure. By definition, then, the *only* material from the iPhone 6s and Hard Drive which the defendants will not receive is information that is not exculpatory, that could not be used to cross-examine Witness-1 or any other potential Government witness, and that does not relate to the subject matter as to which a witness would testify. Thus, defendants have no assertion under *Brady*, *Giglio*, or the Jencks Act.

Defendants seek to justify their request as necessary to identify bases on which to cross-examine a witness they deem "disgruntled," "unhappy," "faithless" and "deceitful." But regardless of this inflammatory rhetoric, the defendants have no legal right to conduct a fishing expedition into a witness's personal data, trampling on both his privacy interests and even his privileged communications. The Government has not only repeatedly confirmed its intention to produce all *Giglio* material regarding Witness-1, it has already disclosed ample information for potential cross-examination, including from the iPhone 6s: the defendants themselves cite those bases for cross-examination in their motion. (*See, e.g.*, Witness-1 Device Mot. at 1, 2-5.) And given its expansive embrace of its disclosure obligations, the Government provided this information to defendants far in advance of any trial, or even before the Court set the trial date. That is far more than the Constitution requires. *See, e.g.*, *United States v. Coppa*, 267 F.3d 132, 144 (2d Cir. 2001) ("we reiterate the longstanding constitutional principle that as long as a defendant possesses *Brady* evidence in time for its effective use [at trial], the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner."). Given the Government's ample, and early, disclosures of all potential *Giglio* information, any additional

review by the defendants of the entirety of the iPhone 6s and Hard Drive would only allow the defendants to review irrelevant or private data, which could never be a basis for cross-examination, or which would be at best "cumulative" to the other lines of cross-examination which defendants already possess. *See, e.g.*, *United States v. Perisco*, 645 F.3d 85, 111 (2d Cir. 2011) (where "undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or is subject to extensive attack by reason of other evidence, the undisclosed evidence may properly be viewed as cumulative, and hence not material, and not worthy of a new trial"). Indeed, defendants do not even attempt to suggest the Government has not, and is not, complying in good faith with its disclosure obligations. *See, e.g., United States v. Zelaya-Romero*, No. 15 CR. 174 (LGS), 2018 WL 1033235, at *3 (S.D.N.Y. Feb. 21, 2018) (Government assurances that it "'is aware of its obligations under Rule 16, *Brady*, and *Giglio*, is currently in compliance with those obligations, and will remain in compliance with those obligations in the future,' are sufficient").

The defendants ask the Court to disregard the significance of Witness-1's privacy interests in his personal data unrelated to this case by noting that Witness-1 relinquished his privacy interests in the iPhone 6s when he signed the consent form in November 2019. (Witness-1 Device Mot. at 6–7, 19.) But the defendants ignore that Witness-1 relinquished his privacy interests in the iPhone 6s vis-à-vis the Government. (*Id.* at Ex. 7 (consent form in which Witness-1 "authorized the United States Attorney's Office, for the Southern District of New York to search to make and keep a copy of any information stored of these devices").) He did not so waive as to the defendants, the owners and founders of his former employer, whom he informed the Government, had engaged in years-long violations of U.S. law. Parties who provide consent to the Government to review their electronic data do not thereby consent to the production of that

data to hostile third parties, except to the extent required by law.  Here, the defendants have no legal basis to review the entirety of Witness-1's devices, accessing non-exculpatory personal data unrelated to the Indictment, his tenure at BitMEX, any potential bias, or the subject of his possible testimony.  The remaining data, not subject to disclosure, potentially contains "a thousand photographs labeled with dates, locations, and descriptions," Witness-1's "private interests or concerns—perhaps a search for certain symptoms of disease, coupled with frequent visits to WebMD" – in other words, "[t]he sum of [his] private life."  *Riley v. California*, 573 U.S. 373, 395–96 (2014).[12]

Defendants cite only in passing to one nominal need for the entire iPhone 6s and the Hard Drive: they assert they need "independent access to and analysis of the Witness-1 devices to determine (for example) whether data he deleted may be recovered or whether Witness-1 modified or fabricated any of the information he provided to the government ███████████████ ████████████" (Witness-1 Device Mot. at 13.)  But this is a red herring.  First, as explained herein, the Government has performed a responsiveness review, and subsequent additional review of the iPhone 6s, and has already and will soon produce all information conceivably subject to disclosure from that device.  Likewise, the Government will be producing to the defense the entire contents of the Hard Drive except for non-discoverable personal information of Witness-1.  Accordingly, the Government has or will produce all information that could bear on Witness-1's credibility, which necessarily includes any indications whether the information the witness deleted could be recovered, and whether he fabricated any information, on the iPhone 6s or the Hard Drive.

---

[12]  Indeed, Witness-1 has described to the Government his serious concerns over the illegitimate use of personal data by the defendants.  Such concerns implicate concerns raised by Judge Broderick, that the Government could not rely on his consent "in perpetuity."  *Collins*, 409 F. Supp. 3d at 244 n.17.  The USAO's recent arrangements to ensure such consent further evidence its good faith and extensive productions to the defendants.

The Government has produced or will soon produce discoverable information, even if originally deleted, which it retrieved from the iPhone 6s and the Hard Drive, including the extractions and any metadata. The Government has reviewed and identified *no* information suggesting that Witness-1 modified or fabricated any evidence provided to the Government.[13] The defendants have no basis to suggest that Witness-1 altered information for that purpose, and instead raise this assertion as a fishing expedition hoping that "something impeaching might turn up." *United States v. Vasquez*, No. 15-CR-252 (PKC), 2021 WL 2186224, at *2–3 (E.D.N.Y. May 27, 2021) (citation omitted). Their unfounded speculation provides no basis for disclosure of Witness-1's personal information.

Indeed, the defendants reference the asserted need for "analysis" of the Witness-1 Devices in a single sentence, without any explanation, facts, or technical expert opinion supporting the type of analysis they wish to undertake, the relevance of that analysis, or any reason to believe the Government's review of the Witness-1 Devices is insufficient. If the defendants' argument were correct, then in every criminal prosecution involving evidence contained on electronic devices, the defendant would be entitled under Rule 16 to a full copy of every electronic device in the Government's possession. That is not what Rule 16 requires.

---

[13] Indeed, as defendants can ascertain, many of the documents which Witness-1 provided to the Government are easily corroborated as authentic, including when comparing similar documents provided by BitMEX. For example, in response to a grand jury subpoena, BitMEX produced to the Government a "country revenue report," namely the report described in Indictment ¶ 27. The country revenue report produced by BitMEX in its initial productions to the Government spanned from November 2017 through July 2018. Witness-1 provided the CFTC with the same document, showing exactly the same revenue totals as the BitMEX copy, but with an additional month of data covering August 2018. After the failure to produce this additional data was raised with BitMEX, the company belatedly indicated it had located and would produce additional versions of reports listing revenue by country. In short, the evidence shows that rather than Witness-1 modifying data, he produced accurate data that the defendants' company would likely have failed to provide in response to a grand jury subpoena but for Witness-1 alerting the Government to its existence.

One specific category of materials on the Witness-1 Devices, namely correspondence subject to a claim of spousal privilege by Witness-1, are further shielded from disclosure because the Government, namely the Investigative Team, does *not* have possession of the entirety of the forensic image of the Devices. The Investigative Team only possesses those materials determined to not be privileged by the Filter Team. After Witness-1 consented to the Government's search of the devices, he provided the names and other identifying information for his wife and attorneys before the Government began its review of the iPhone 6s. The Government's Filter Team segregated communications with those individuals from the Devices, and has not released the materials to the Investigative Team. With respect to the iPhone 6s, the Filter Team identified and segregated communications between Witness-1 and his wife. The Investigative Team has never reviewed these communications. Based on Witness-1's November 17, 2019 revocation of consent for the Government to search the messages in his WhatsApp and Gmail accounts, his subsequent provision of his wife's name and identifying information clarifies that his earlier consent did not constitute a waiver of his spousal privilege (or in the alternative constituted a withdrawal of his prior consent).[14] Because the Investigative Team does not have "possession, custody, or control" of the communications potentially subject to Witness-1's spousal privilege, defendants are not entitled to those communications under Rule 16.[15]

---

[14] Defendants provide no basis under the law or facts to evidence that Witness-1 has waived the applicable privileges, given his revocation of his prior consent over certain materials, and his provision of his spouse's name and identifying information to the Government.

[15] With respect to the Hard Drive, the Filter Team identified materials that potentially implicated BitMEX's corporate privilege. In June 2021, BitMEX informed the Investigative Team that, while it consented to production of the potentially privileged materials to the defendants, it did not so consent as to provision to the Investigative Team. Those materials are also outside the Investigative Team's "possession, custody, or control," and thus outside of Rule 16. The Filter Team has nonetheless arranged to produce the materials subject to a potential corporate privilege claim, which are outside of Rule 16, to the defendants, so the motion to compel those materials are moot.

The defendants cite to two cases from other districts where a court has imposed relief similar to[16] the relief that they seek. *United States v. Perman* is wholly distinguishable from this case. No. CR1801015001TUCRMEJM, 2020 WL 2812834 (D. Ariz. May 29, 2020). That case involved an alleged violation of the Computer Fraud and Abuse Act, and the defendant asserted that the case turned on whether the corporate victim "in fact had access to" certain intellectual property data on its servers at the relevant period of time. *Id.* at *2. In support of his discovery request, the defendant submitted an affidavit from "a technology forensics expert." *Id.* On these facts, including the expert's opinion, the Court agreed with the defendant's assertion that the entirety of the servers was relevant, because the defendant needed to determine whether "the availability or integrity of [the victim's] IP or other data was impaired as a result of the alleged extortion." *Id.* at *6. Here, by contrast, the Devices are not at the core of the Government's case, which has nothing to do with the Devices themselves. Instead, the only significance of the Devices are their content, namely evidence relevant to the Government's charge or otherwise subject to disclosure, and the Government has produced or will produce all such evidence. Further, the defendants provide no basis, such as an expert declaration, suggesting any specific need for disclosure of the Devices.

Defendants also rely on *United States v. Savedoff*. 16-CR-41G, 2017 WL 2305751 (W.D.N.Y. May 25, 2017). The magistrate's decision in that case is simply incorrect, unmoored from Rule 16, and devoid of any analysis actually supporting the ordered relief. Consistent with Rule 16, the Government there agreed to "shar[e] information on the hard drive that might have

---

[16] Defendants also cite to factually distinct child pornography cases, where courts have compelled disclosure of the entirety of hard drives *that belonged to the defendants themselves* back to the defendants. (Witness-1 Device Mot. at 17). That of course has nothing to do with compelling disclosure of forensic images that did not originally belong to the defendants.

39

some bearing on this case, regardless of its position on how relevant that information really is." *Id.* at *1.[17]  But after assessing that "information from the hard drive w[ould] make its way to the Government's case-in-chief," *id.* at *2, the Western District Magistrate Judge applied the wrong remedy: *such information* was subject to disclosure under Rule 16, not the entirety of the hard drive (or its forensic image), to the extent the Government did not intend to admit the entire hard drive in its case-in-chief.  The magistrate judge misunderstood that crucial distinction, conflating "the hard drive" at issue in that case with the witness' "documents related to the" defendants' crime that could potentially exist on the hard drive.  *Id.* at *2.  For good reason, no other court has ever followed *Savedoff*.

Notwithstanding the isolated decision in *Savedoff*, then, Rule 16 and *Brady/Giglio* require the Government to produce to the defendants only the "items" – namely, evidence – that are material to preparing their defense, that the Government intends to use in its case-in-chief, that are exculpatory, or that are impeaching of a witness – not the electronic devices from which those items were recovered.  That is what the Government has done and will soon complete in this case, and courts in this Circuit have routinely held that "[w]here the Government makes good faith representations that it is complying with Rule 16, and that it will continue to do so," there is no basis for the court to compel specific discovery requests.  *United States v. Zelaya-Romero*, No. 15 CR. 174 (LGS), 2018 WL 1033235, at *3 (S.D.N.Y. Feb. 21, 2018) (Government assurances that it "'is aware of its obligations under Rule 16, *Brady*, and *Giglio*, is currently in compliance with

---

[17]  *Savedoff* is further distinguishable from the present case in that there was no suggestion that the information in question included privileged materials.

those obligations, and will remain in compliance with those obligations in the future,' are sufficient").[18]

## CONCLUSION

For the reasons set forth above, the Court should deny the defendants' motions to compel purported *Brady* material and Rule 16 discovery.

Dated: New York, New York
       July 6, 2021

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By:  /s/ _____
     Jessica Greenwood
     Samuel Raymond
     Assistant United States Attorneys
     (212) 637-2360/6519

---

[18] Even the incorrect ruling in *Savedoff* does not support the defendants' request that the Devices be produced to them subject only to the protections of the current protective order. There, the Court required that the "entirety of the copy of the hard drive be restricted to attorney eyes only." 2017 WL 2305751, at *3. Defense counsel could not share any documents with their clients until they had obtained "permission from the Court." *Id.*

41