

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 13, 2021

**BY ECF**

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:  *United States v. Hayes, et al.*, 20 Cr. 500 (JGK

Dear Judge Koeltl:

  The Government respectfully submits this letter in response to the request to charge submitted by the defendants. See Dkt. No. 209. The Government respectfully submits that the defendants' proposed jury instructions contain certain errors of law, in particular: (a) multiple errors in the defendants' proposed definition of "futures commission merchant"; (b) an erroneous description of the jurisdictional scope of the Commodity Exchange Act ("CEA"); and (c) an erroneous instruction on willfulness.[1] This letter provides a brief overview of the Government's position on these issues, and the Government is prepared to submit more detailed briefing in advance of trial on these issues as the Court directs.

  A. Definition of Futures Commission Merchant

  Both parties have submitted a definition of a futures commission merchant, which is a type of entity defined in the CEA and subject to the Bank Secrecy Act ("BSA"). The parties agree that if BitMEX met the definition of a futures commission merchant during the charged time period, then it was subject to the requirements of the BSA. Accordingly, the Government's proposed instruction accurately conveys the statutory definition of a futures commission merchant, and is followed by an instruction defining the key terms relevant to that definition, with the definition of each term based on the applicable statutory or regulatory definition. *See* Dkt. No. 211, at 9-12.

---

[1] The Government is highlighting these errors in the defendants' proposed instructions as particularly significant, but notes that it disagrees with other aspects of the defendants' request to charge and respectfully submits that where the parties' requests differ, the Government's requests more accurately reflect the applicable law.

By contrast, the defendants have submitted a lengthy proposed instruction that contains a number of statements that are erroneous as a matter of law, calculated to mislead the jury, or both. Those errors include the following:

First, the defendants' proposed instruction erroneously states that if the jury finds that BitMEX "was a futures exchange, swap execution facility, or clearinghouse, or any other type of business not required to register as a futures commission merchant, then you must find the defendants not guilty." Dkt. No. 209, at 19. That statement, for which the defendants offer no citation, wrongly indicates that if BitMEX was one of the other listed types of business, it was not required to register as a futures commission merchant. That is incorrect. The relevant question is whether BitMEX met the definition of a futures commission merchant, in which case it was subject to the BSA. It is irrelevant whether it may have also performed functions that made it a futures exchange, swap execution facility, or other type of entity. Indeed, the CFTC's civil complaint against BitMEX specifically alleges both that BitMEX operated as a futures commission merchant, and also that BitMEX operated as a designated contract market or swap execution facility. *See* Complaint ¶¶ 116-128, *CFTC v. HDR Global Trading Ltd., et al.*, 20-cv-8132 (S.D.N.Y. 2020), Dkt. No. 1. Here, the Indictment charges the defendants with operating a futures commission merchant, and the jury should be instructed on the definition of a futures commission merchant. It is irrelevant whether BitMEX also met the definition of other types of entities.

Relatedly, the defendants' proposed instruction states that "accepting orders" means accepting orders "to be sent to a futures exchange or swap execution facility for execution," and states that "margin" is collateral for transactions that a futures commission merchant then "executes on behalf of the investor on a futures exchange or swap execution facility." Dkt. No. 209, at 20. Both of those instructions misleadingly imply that if BitMEX itself was providing the functions of an exchange or swap execution facility, rather than sending the transactions to an outside entity for execution, that would somehow be inconsistent with it being a futures commission merchant. In fact, the statutory definition of futures commission merchant does not contain any reference to sending orders to or executing orders on a futures exchange or swap execution facility. *See* 7 U.S.C. § 1a(28) (definition of futures commission merchant); *see also* 17 C.F.R. § 1.3 (definitions of initial margin and customer margin contain no reference to where orders are executed). The defendants' request to charge inserts this surplus language in a manner that is calculated to mislead the jury.

Second, the defendants' proposed instruction erroneously limits the scope of what it means to "solicit orders" for futures or other types of commodity instructions. Specifically, the defendants' instruction states that "general marketing activity, such as speaking at conferences, on television or on social media, without directly soliciting or asking a person or entity for an order to purchase or sell a relevant product, does not constitute the act of soliciting orders." Dkt. No. 209, at 20. That statement, which again comes without any citation, is incorrect. In fact, it is belied by the very cases cited immediately prior in the defendants' request to charge. Those cases make clear that marketing for a company that offers commodity transactions does constitute solicitation of orders. *See CFTC v. Standard Forex, Inc.*, 1998 WL 236923, at *7 (E.D.N.Y. 1998) (holding that defendant "solicited orders by newspaper advertisement and telephone call")[2]; *CFTC v.*

---

[2] Another opinion in the same case explains the nature of these solicitations further, noting that the defendant had "marketed [commodity contracts] to members of the general public" and had

*Paramount Management, LLC*, No. 13 Civ. 4436 (CM), 2013 WL 5586216, at *3 (S.D.N.Y. Sept. 9, 2013) (holding that a defendant engaged in solicitation through the use of a "website and telemarketing techniques" to "solicit[] the retail public to open leveraged forex trading accounts"). Thus, the defendants' attempt to incorrectly instruct the jury that marketing activity for BitMEX in the United States did not constitute solicitation of orders should be rejected.

  B.  Territorial Scope of Commodity Exchange Act

Both parties have submitted instructions relating to the territorial scope of the Commodity Exchange Act. The parties both cite 7 U.S.C. § 6, which states that it is unlawful for any person to "offer to enter into, to enter into, to execute, to confirm the execution of, or to conduct any office or business anywhere in the United States, its territories or possessions, for the purpose of soliciting or accepting any order for, or otherwise dealing in, any transaction in, or in connection with, a contract for the purchase or sale of a commodity for future delivery," without complying with the Act. *See* Dkt. No. 211, at 9 (Government's proposed instruction regarding United States operations giving rise to CEA application); Dkt. No. 209, at 22 (defendants' proposed instruction regarding United States operations). This language establishes that the CEA applies to entities that conduct operations in the United States, have offices in the United States, accept trades from United States persons, or market to United States persons, in connection with commodity futures transactions.

The Government's proposed instruction accurately summarizes this statutory language, but the defendants' proposed instruction bears little resemblance to it. Most notably, the defendants propose that the jury be instructed—twice—that an entity is not subject to the Act if it "takes reasonable steps to exclude U.S. persons from transacting on its platform." Dkt. No. 209, at 22. There is no legal basis for that instruction. None of the defendants' cited sources use the phrase "reasonable steps to exclude U.S. persons" or any variation thereof, and the Government is aware of no relevant authority for that language, which appears to be a formulation the defendants have invented out of whole cloth. The defendants' proposed instruction also specifically avoids informing the jury that an entity that conducts business or has an office in the United States in connection with commodity futures transactions is subject to the CEA.

More generally, the sources cited by the defendants in connection with their proposed instruction are either irrelevant or support the Government's position. The defendants cite two CFTC guidance documents that interpreted the 2010 amendments to the CEA which govern swap dealers.[3] As to swap dealers, there is a separate provision in the CEA dealing with its extraterritorial application, 7 U.S.C. § 2(i), which the defendants cite even though it does not apply to futures commission merchants.[4] Those authorities simply have no bearing on this case, in which the Government has alleged that BitMEX is a futures commission merchant, not that it is a swap dealer.

---

"advertised in … periodicals." *CFTC v. Standard Forex, Inc.*, 1996 WL 435440, at *4 (E.D.N.Y. July 25, 1996).

[3] See Dkt. No. 209, at 22, n. 32 (Interpretive Guidance and Policy Statement Regarding Compliance With Certain Swap Reguls., 78 Fed. Reg. 45292, 45315 (July 26, 2013) (17 C.F.R. ch. 1); and CFTC, Div. of Mkt. Oversight Guidance on Application of Certain Comm'n Reguls. to Swap Execution Facilities, Comm. Fut. L. Rep. (CCH) ¶ 32,863 (Nov. 15, 2013)).

[4] *See* Dkt. No. 209, at 22, n. 32 (citing 7 U.S.C. § 2(i)).

The only even arguably relevant source cited by the defendants is a 1993 letter from the CFTC's Division of Trading and Markets in response to a request for an exemption to certain disclosure requirements for foreign persons soliciting non-U.S. persons for participation in a commodity pool.[5] As this description suggests, the defendants seem to be grasping at straws in citing this "authority." There are at least five reasons not to rely on that letter here: (i) it is nearly three decades old; (ii) it reflects the views of one division of the CFTC and specifically states that it is "does not necessarily represent the views of the Commission"; (iii) it is in response to a request for an exemption from the CEA, which is something the defendants in this case never requested or received; (iv) it deals with commodity pools, not futures commission merchants; and (v) it is tailored to the particular facts of the people making the exemption request, not meant as general guidance about the scope of the CEA. *See* CFTC Interpretative Letter No. 93-106. (Request For Relief In Connection With Offshore Marketing Activities), Comm. Fut. L. Rep. ¶ 25898, 1993 WL 13938356. On top of all of that, the actual substance of the letter fully supports the Government's position here. The letter explains that the Division of Trading and Markets supported the requested exemption only because it applied to people who did not "conduct[] any solicitation for the pool from the U.S. or undertake[] any marketing activities that could reasonably be expected to have the effect of soliciting participation in the pool by U.S. persons." *Id.* By implication, the CFTC staff would not have agreed to exempt anyone who did market to U.S. persons, or even who conducted marketing that could have the effect of reaching U.S. persons, activities that are squarely within the jurisdictional scope of the CEA.

C. <u>Meaning of "Willfully"</u>

The parties have also submitted instructions about the meaning of acting "willfully" in violating the CEA. Dkt. No. 211, at 17 (Government's proposal); Dkt. No. 209, at 27 (defendants' proposal). This requirement is rooted in the Supreme Court's decision in *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994), which held with respect to a structuring charge, which is also a violation of the Bank Secrecy Act,[6] that "the Government must prove that the defendant acted with knowledge that his conduct was unlawful." The Government's proposed instruction includes this language and explains that this means the Government must prove that the defendants knew about the requirement for BitMEX to have an anti-money laundering policy and intentionally violated it. This instruction is rooted both in *Ratzlaf* and in the Second Circuit's subsequent description of the elements of 31 U.S.C. § 5322 as requiring proof of a defendant's "knowledge that it was unlawful" to fail to comply with a regulation. *See United States v. Robins*, 673 Fed. Appx. 13 (2d Cir. 2016).

The defendants also include the language from *Ratzlaf*, but then add various surplus language that could only serve to confuse or mislead the jury. First, the defendants request an instruction that the purpose of the willfulness requirement is to "avoid the danger of ensnaring individuals engaged in apparently innocent conduct." While this language is used in the case law,

---

[5] See Dkt. No. 209, at 22 n. 32 (citing CFTC Interpretative Letter No. 93-106. (Request For Relief In Connection With Offshore Marketing Activities), Comm. Fut. L. Rep. ¶ 25898, 1993 WL 13938356).

[6] Soon after *Ratzlaf*, Congress amended the BSA to remove the "willfulness" requirement for structuring offenses. *See, e.g.*, *United States v. Taylor*, 816 F.3d 12, 23 n.11 (2d Cir. 2016).

Page 5

it is not typically included in jury instructions, and its inclusion here would unfairly suggest to the jury that the defendants' conduct was "apparently innocent."

The defendants' proposed instruction goes even further astray in itemizing a number of things that the defendants would purportedly have had to know. For instance, the defendants claim that the Government must prove that they knew BitMEX was a futures commission merchant, knew that it was required to register with the CFTC, and knew that "because it was a futures commission merchant, BitMEX was a financial institution under the BSA and was therefore required to establish and maintain an anti-money laundering program." Dkt. No. 209, at 27. The defendants do not cite any case law or prior jury charge that contained such an extensive list of regulatory knowledge. They do cite two prior jury charges from this district, but the language of both was far closer to the Government's proposed instruction and did not contain any such detailed itemization of the regulatory framework.[7] The reason that no such instruction is typically given is that it goes far beyond the standard actually set forth in *Ratzlaf*, which requires that the defendants have known that they had a legal duty and intentionally violated that known duty.[8]

That concept is fully captured in the Government's proposed instruction.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:     s/ Thane Rehn
Samuel L. Raymond
Jessica Greenwood
Thane Rehn
Assistant United States Attorneys
(212) 637-2354

cc:     Defense counsel

---

[7] Trial Tr. at 11983, *United States v. O'Hara*, 10 Cr. 228 (LTS) (S.D.N.Y. Mar 17, 2014), Dkt. No. 948 ("[W]illfully means to act knowingly and purposely with an intent to do something the law forbids."); Trial Tr. at 2393, *United States v. Chichakli*, 09 Cr. 1002 (WHP) (S.D.N.Y. Dec 11, 2013), Dkt. No. 137 ("An act is done willfully if it is done knowingly and purposefully with an intent to do something the law forbids.")

[8] *See, e.g.*, Trial Tr. at 8863, *United States v. Hundley*, 02 Cr. 411 (LAP) (S.D.N.Y. Jan. 27, 2004) ("A willful act in this context is defined as a voluntary and intentional violation of a known legal duty."); Trial Tr. at 2154-55, *United States v. Little*, 12 Cr. 647 (PKC) (S.D.N.Y. Apr. 6, 2018) (same).