



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 6, 2022

**BY ECF, E-MAIL, and HAND**

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re: *United States v. Samuel Reed*, 20 Cr. 500 (JGK)

Dear Judge Koeltl:

      The Government respectfully submits this letter in advance of the sentencing of defendant Samuel Reed, currently scheduled for July 13, 2022 at 3:00 p.m., and in response to the defendant's sentencing memorandum ("Def. Mem").

      Samuel Reed was a co-founder, 30 percent owner, and high-ranking executive, of BitMEX. Reed earned hundreds of millions of dollars from BitMEX's operations, while willfully and continuously operating the Company in violation of the Bank Secrecy Act ("BSA"), by failing to implement an anti-money laundering ("AML") program. During the charged period, as BitMEX grew to become one of the largest cryptocurrency derivatives platforms in the world, the defendant enabled BitMEX to allow its users to transact trillions of dollars anonymously, because he and his co-founders decided not to implement a know-your-customer ("KYC") procedure. Over the course of the charged period, Reed repeatedly learned that BitMEX's customers included nefarious actors using the platform for illegal purposes, but took no steps to actually implement a KYC or AML program.

      As the Court knows, the Government requested an above-Guidelines sentence for Arthur Hayes, and then a Guidelines sentence for Benjamin Delo. On May 20, 2022, the Court instead sentenced Hayes to a sentence of two years' probation, with the first six months to be served on home detention; on June 15, the Court sentenced Delo to a below Guidelines-sentence of 30 months' probation. The Government respectfully disagrees with both sentences. On a blank slate, the Government would recommend a sentence above the 0 to 6 months' under the applicable Sentencing Guidelines, although less than the sentence the Government believes is appropriate for Hayes and Delo. Recognizing that such a sentence would create a sentencing disparity with Hayes and Delo, the Government instead requests that the Court impose on Reed a Guidelines sentence, namely a sentence of two years' probation.

I.        **Reed's Conduct**

A.  **Background of BitMEX**

Reed, Hayes, and Delo are the co-founders and equal owners of BitMEX.  They launched BitMEX in 2014. (Presentence Investigation Report ("PSR") ¶ 14). During applicable periods from that launch to at least in or about October 2020, the Company offered financial derivatives, including futures contracts and swaps, tied to the price of Bitcoin and other cryptocurrencies, which settled in Bitcoin. (PSR ¶¶ 14–15). Because BitMEX operated in the United States, including through offering its products to U.S. customers and operating offices in the United States, the Company was a futures commission merchant ("FCM"), which is required under the Commodity Exchange Act ("CEA") to register with the Commodity Futures Trading Commission ("CFTC"), and is a financial institution which must comply with the Bank Secrecy Act.  (PSR ¶ 15). From its launch in 2014, BitMEX acted in violation of the BSA; Reed and his co-conspirators began willfully violating that law by at least in or about September 2015, when the CFTC issued regulatory orders announcing its view that cryptocurrency is a commodity, and the defendants knew that their failure to implement an AML program while operating in the United States was unlawful.

Reed played an important role at BitMEX, as Chief Technology Officer focused on the Company's technological decisions. (PSR ¶¶ 19, 57). As a founder of the Company and a C-suite executive, Reed had supervisory authority within BitMEX, and he made technological choices about how to design various specifications that he knew meant that U.S. customers would continue to trade on the platform.  However, the Government agrees that unlike Hayes and Delo, both of whom had years of experience in the financial services industry, Reed was not a leader of the criminal conduct engaged in by BitMEX. (PSR ¶ 57).

From its inception, BitMEX, with Reed's knowledge, flaunted its avoidance of KYC requirements. In its earliest days, BitMEX advertised that it did not perform know-your-customer checks. Shortly before the launch of the program for live trading in November 2014, Hayes wrote to Delo that BitMEX would not do any KYC, saying "Basically just valid email address until we feel significant pressure to do otherwise." In about 2015, the website advertised that "No real name or other advanced verification is required on BitMEX." (PSR ¶ 18). In August 2015, Reed himself wrote in an email to a customer that one of BitMEX's advantages was that it offered its customers "the freedom to create an account without onerous KYC requirements."  Until at least August 2017, BitMEX's registration page required users to provide a username, email address, and password; but explicitly stated that first and last name were "not required" to register and were only "used for verification purposes if you lose your two-factor auth[entication]" for account login. While that language on BitMEX's website was later removed, BitMEX still did not require users to verify their identities until after the Indictment was unsealed.

B.  **Reed Understood, and Defied, U.S. Law**

Reed and his co-defendants followed global regulation of cryptocurrency, particularly from the United States, very closely.  Those regulations guided BitMEX's business decisions.  First, the defendants chose to incorporate in the Seychelles specifically because the country "had no clarity

on Bitcoin." (PSR ¶ 16). Second, the defendants designed the very architecture of BitMEX to avoid KYC regulations, stating that they chose to transact with BitMEX's customers exclusively in Bitcoin because, as of 2014, their view was that there was no "gov[ernmen]t regulation covering KYC or AML" for such transactions. (PSR ¶ 16).[1]

Reed and his co-founders soon came to understand that their business model did not exempt them from KYC and AML regulations. In September 2015, the CFTC issued two public administrative actions, which announced the Commission's view that cryptocurrency was a commodity subject to regulation under the CEA. (PSR ¶ 17(b)). As Reed admitted in his allocution, he "understood that if [BitMEX] had U.S. users trading on the platform, there would be a requirement under U.S. law for BitMEX to have a customer identification or 'know your customer' program." (PSR ¶ 63).

Given the choice between complying with the BSA or withdrawing from the United States, the defendants putatively chose the latter: they put a notice on BitMEX's website and in its terms of service stating that U.S. customers were forbidden from creating accounts, and restricted individuals from creating an account using an internet protocol ("IP") address from the United States. (PSR ¶ 17).[2] However, Reed knew that the controls were easily evaded, and did not take simple steps to restrict more U.S. customers from accessing the platform.

Reed knew U.S. customers continued to access BitMEX through several means. First, BitMEX already had a significant number of U.S. users in September 2015 and made no effort to remove them. (PSR ¶ 24). Second, Reed and his co-defendants did not actually bar U.S. IP addresses from the platform. Instead, BitMEX only ran a single IP address check when new users created accounts, even though Reed knew that users could easily avoid the initial check, including by using virtual private network services ("VPN")[3] and then make subsequent logins from U.S. IP addresses. (PSR ¶ 29). Third, BitMEX intentionally marketed to U.S. customers, including through Hayes' appearances on U.S. media outlets and through the BitMEX affiliate user program. (PSR ¶¶ 33–35). Fourth, Reed allowed some users who he personally knew were U.S. persons to access

---

[1] The Department of Treasury had in 2013 published public guidance documents that it interpreted the BSA as covering institutions that exchanged between cryptocurrency and fiat currency.

[2] Even these restrictions did not mean the Company was not operating in the United States, since Reed, and later Greg Dwyer, were physically based in the United States while carrying out their duties, and BitMEX had numerous other employees physically present in the U.S., including from an office in Manhattan.

[3] Reed points to examples where he warned customers not to use VPNs to access BitMEX. Def. Mem. at 15. But as he appears to admit, he did not implement any technical restrictions on VPN usage by BitMEX's customers. That failure is stark in light of his active usage of Reddit, where he and other BitMEX employees frequently reviewed posts (including on the page devoted to BitMEX itself) where customers mentioned using VPNs to trade on the platform, including to evade the U.S. user ban. The Company also received emails to its Support line, which Reed often monitored and responded to, some of which similarly showed that customers were using VPNs to evade the IP controls.

and trade on BitMEX's platform openly.[4] (PSR ¶ 28). Fifth, as defendant Hayes acknowledged, users whose accounts were closed because they had been flagged as from the United States could still open a new account, even if they used the exact same email address as the closed account. Hayes Mem. at 14 n.9.

As Reed admits, he played an important technical role in another means for BitMEX users to remain anonymous for a few months during the charged period, through BitMEX's Tor "hidden service" which he personally announced on BitMEX's social media platforms. (PSR ¶ 30); Def. Mem. at 15.  This hidden service fostered a clear breach of the BSA's KYC requirement, since it was specifically designed to "add another level of online security and privacy for the user," Def. Mem. at 15, which Reed advertised further protected BitMEX users' identities even "from us as well." (PSR ¶ 30).[5]

The presence of U.S. users was far from incidental. On the contrary, as late as July 2017, nearly two years after claiming to have banned U.S. users, Reed received a report from Greg Dwyer that showed that the "United States remains the most popular country by visits and average number of active users per day." (PSR ¶ 21). Subsequent monthly revenue reports continued to show the presence of U.S. users on BitMEX. (PSR ¶ 22).[6] Like his co-defendants, Reed claims that BitMEX turned away large numbers of U.S. users, Def. Mem. at 15, but again, the Government

---

[4]  Reed tries to defend his actions regarding his "childhood friend" User-3, Def. Mem. at 16, but his response is aggravating, not mitigating. Reed knew that BitMEX could not operate in the United States, which meant that U.S. users could not trade on BitMEX, even if he was personal friends with the user or they had previously given "helpful feedback" about BitMEX.

[5]  Reed states that because the Company rolled out the hidden service before the CFTC's actions on cryptocurrency or the U.S. user ban, the Court should not conclude that its implementation was constructed as a "workaround." Def. Mem. at 15. That position is incorrect for at least two reasons: first, the Company had indeed putatively restricted customers from New York state as of August 2015 when the state enacted the BitLicense laws, Def. Mem. at 7, so when Reed announced the Tor hidden service he did so knowing that this could lead BitMEX users to evade the Company's existing controls; second, as he admits, the Tor hidden service was operative as of "November 2015," months after the Company had putatively restricted customers from the U.S.

[6]  Reed argues that one report showing U.S. traders, described in (PSR ¶ 23), that he personally reviewed in December 2018 was erroneous. Def. Mem. at 16. But in doing so, he overstates his argument, since the evidence he cites does not show that anyone has actually "confirmed that the data was in fact erroneous."  Instead, Delo stated it was "probably" a mistake, and the employee who crafted the report stated that Reed's description was "a possible explanation." Regardless, Reed himself took no steps to determine whether the data was incorrect, and then, just a month after reviewing this report, Reed flatly told the CFTC under oath that he was not aware of any BitMEX reports that identified U.S. customers trading on its platform, instead of providing appropriate caveats to this declaratory statement. (PSR ¶ 23).

has highlighted the numerous errors in the supposed expert analysis he relied upon. Dkt. No. 280 at 15–17, 18–21.[7]

Despite Reed and his co-founders' knowledge that allowing these users meant that BitMEX was subject to U.S. law including the BSA, BitMEX never required all users to provide their real names and identification documents until after the unsealing of the Indictment; nor did the Company file any SARs with FinCEN between its launch and the unsealing of the Indictment, despite ample knowledge of suspicious activities.

### C. The Defendant Knew that BitMEX was a Tool for Criminal Activity

As a result of Reed's decisions not to implement an AML program, BitMEX became a magnet for money laundering and criminal activity, which Reed knew and did little to stop. Because BitMEX did not require KYC, the full scope of criminal conduct on BitMEX will never be known. BitMEX, still owned by Hayes, Delo, and Reed, accepted a settlement with the Department of Treasury's Financial Crimes Enforcement Network ("FinCEN") in which it neither admitted nor denied FinCEN's finding that it had conducted more than $200 million in suspicious transactions, and that the Company had failed to file SARs on nearly 600 specific suspicious transactions. (PSR ¶ 42); FinCEN Announces $100 Million Enforcement Action Against Unregistered Futures Commission Merchant BitMEX for Willful Violations of the Bank Secrecy Act, *available at* https://www.fincen.gov/news/news-releases/fincen-announces-100-million-enforcement-action-against-unregistered-futures. As the Government described in its memorandum related to Hayes' sentencing, the Government has seen BitMEX surface repeatedly in its own criminal investigations.[8] Even after learning about criminal conduct on the platform, Reed took no steps until the Indictment was unsealed to actually implement a BSA-compliant AML program.[9]

---

[7] Further, even this amount of money supposedly turned away by the Company is about half of the amount of suspicious transactions FinCEN identified in its consent order, described below.

[8] Reed highlights supposed technical features that he asserts show that he believed BitMEX was unattractive to individuals looking to launder criminal proceeds. Def. Mem. 17 & n.8. But any such belief would be belied by the numerous law enforcement requests alleging precisely such criminal activity sent to BitMEX, many of which he was aware. (PSR ¶¶ 42–43). Those requests, including the email he received from an attorney for a victim of a hacked cryptocurrency company, should have at the least made clear to Reed that the technical features did less to dissuade money laundering than he may have thought. The same is true for BitMEX's infrequent filing of suspicious transaction reports to the Seychelles regulators.

[9] Reed cites BitMEX's eventual adoption of a KYC program as positive and unique. Def. Mem. at 9 ("Notably, BitMEX was among the first cryptocurrency trading platforms to implement full KYC for its entire user base, and even at the time of this submission, a substantial amount of cryptocurrency derivatives trading takes place on exchanges with KYC requirements less strict than BitMEX's or with no KYC requirements at all."). Of course, this would be more meaningful if BitMEX had completed this process *before* the Company's founders had been indicted for failure to comply with the BSA.

As the Government has previously described, BitMEX also had a deficient compliance program with respect to U.S. sanctions. From the earliest days of the company, compliance consultants offered their services to BitMEX, and mentioned that they offered sanctions programs. BitMEX counterparties also sometimes mentioned the need for a counter-sanctions program. By no later than October 2017, Reed knew that the company could not transact with individuals on the U.S. sanctions list, and implemented some controls designed to try to restrict such transactions. (PSR ¶ 45). Without an adequate KYC program, BitMEX could never be sure it was not dealing with sanctioned individuals, who could use the same simple methods to evade the controls as those used by U.S. persons. As a result, BitMEX internal reports shared with the defendant showed that BitMEX continued to earn revenue from customers in Iran through at least April 2018. (PSR ¶ 46).

## II.    Procedural History

On October 1, 2020, Reed was arrested in Massachusetts, and the Indictment was unsealed. On February 28, 2022, a superseding indictment was returned by the grand jury.  After pre-trial motion practice, Reed ultimately entered a plea of guilty to Count One of the original Indictment, violating the Bank Secrecy Act, in violation of Title 31, United States Code, Sections 5318 and 5322; and Title 31, Code of Federal Regulations, Sections 1026.210 and 1026.220, a few weeks before trial was scheduled.  He is the third defendant to be sentenced in this case; as the Court knows, Arthur Hayes was sentenced to two years probation, six months' home detention; Benjamin Delo to thirty months probation. Reed's sentencing is scheduled for July 13, 2022.

## III.    Presentence Investigation Report

The Probation Office has calculated the offense level as follows, and as consistent with the plea agreement: (1) pursuant to U.S.S.G. § 2S1.3(a)(1), the base offense level is 8; (2) two levels are removed for acceptance of responsibility, so the specific offense level is 6. (PSR ¶¶ 64–73). The defendant has no criminal history points, and is in Criminal History Category I.

This offense level and criminal history category lead to a Guidelines range of 0 to 6 months' imprisonment. (PSR ¶ 117.) The Government agrees with the Probation Office's calculation.

Probation has recommended a non-incarceratory sentence, with two years' probation. (PSR p. 42–53). This recommendation is based on his lack of criminal history, and because his Guidelines range is in Zone A. Probation also cites to the $10 million fine the defendant has paid in this case.

## IV.    A Sentence of Probation is Appropriate Under the 3553(a) Factors

### A.  Applicable Law

As the Court knows well, the Sentencing Guidelines are no longer mandatory after *United States v. Booker*, 543 U.S. 220 (2005).  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). After making the initial

Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing: "a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)).

In light of *Booker*, the Second Circuit has instructed that district courts should engage in a three-step sentencing procedure. *See United States v. Crosby*, 397 F.3d 103, 111-13 (2d Cir. 2005), *abrogated on other grounds by United States v. Fagans*, 406 F.3d 138 (2d Cir. 2005). First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Id*. at 112; *see also United States v. Corsey,* 723 F.3d 366, 375 (2d Cir. 2013) ("Even in cases where courts depart or impose a non-Guidelines sentence, the Guidelines range sets an important benchmark against which to measure an appropriate sentence."). Second, the Court must consider whether a departure from that Guidelines range is appropriate. *See Crosby*, 397 F.3d at 112. Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. *Id.* In so doing, it is entirely proper for a judge to take into consideration his or her "own sense of what is a fair and just sentence under all the circumstances." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

## B. Discussion

The Government previously argued that co-defendants Arthur Hayes and Benjamin Delo both merited above-Guidelines sentences of incarceration. On a blank slate, the Government would take a similar view, requesting a period of incarceration for Reed (although a lesser term than Hayes or Delo). The 3553(a) factors all weigh in favor of such a sentence. Recognizing that the Court disagreed with that recommendation, and given the Government's agreement that Reed does not merit a greater sentence than imposed on Hayes and Delo, because such a sentence would create an unwarranted disparity, the Government respectfully requests that the Court impose a sentence of two years' probation, consistent with the recommendation from the Probation Department in the PSR.

In response, Reed requests a time served sentence, with no term of probation. But such a sentence would be inadequate under Section 3553.

A sentence with a term of probation is merited because of the seriousness of the offense. Reed participated in criminal activity at the Company he founded for half a decade. Reed ignored the BSA, and its provisions designed to safeguard the financial system, which meant that BitMEX allowed numerous cryptocurrency users to launder money without providing their true identities. Reed benefited financially to the tune of hundreds of millions of dollars.

A sentence that includes a term of probation is also appropriate to avoid unwarranted disparities. A time served sentence would lead to an unwarranted disparity compared with Hayes

and Delo. While the Government agrees that Reed is less culpable than those two co-defendants, there is no question that like them he is guilty of a serious crime. A sentence of two years probation would reflect his lesser culpability (since his sentence would not include a period of home incarceration like Hayes' did, and would be shorter than Delo's) but properly reflect that he was also a founder of BitMEX, who earned hundreds of millions of dollars from its criminal conduct. Reed's role as technologist meant he was uniquely situated to design and implement appropriate controls to restrict U.S. customers. Additionally, like Hayes and Delo, Reed was included on some of the dozens of law enforcement inquiries that BitMEX received, and never thereafter pushed for the Company to actually implement anti-money laundering programs. Reed asserts that a sentence beyond time served would be "overly harsh," Def. Mem. at 21, but offers no reason for why a term of probation would fit that description.

A probationary sentence is also necessary to promote respect for the law and to afford adequate specific and general deterrence. The defendant defied U.S. law for years. A time served sentence would send an inadequate message, to both the defendant and those others reviewing these charges, about the consequences of such an offense.

Finally, a sentence of probation is also appropriate given Reed's history and characteristics. Reed was a well-trained computer scientist, who could have used those skills for many lawful and highly remunerative occupations. Instead, he decided to engage in the instant conduct for years. While the Court should take Reed's charitable contributions into account, the fact that the defendant was able to give millions of dollars to charity no doubt resulted in large part from the fact that he personally received over $100 million in dividends from BitMEX while the company systematically flouted the BSA for a period of five years, and further, the Guidelines describes that such "prior good works are not ordinarily relevant in determining whether a departure is warranted." *See* U.S.S.G. § 5H1.11.[10]

---

[10]

**V.       Conclusion**

For the reasons stated above, the Court should impose a sentence of two years' probation, which is necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a).[11]

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

by: /s
    Samuel L. Raymond
    Thane Rehn
    Assistant United States Attorneys
    (212) 637-6519

cc: Counsel for Defendant Samuel Reed

---

[11] The Government has no objection to the defendant's requests that he be allowed to travel both domestically and internationally, or that his other terms of probation be similar to those imposed on Hayes and Delo.