UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

      v.                       20 CR 500 (JGK)

BENJAMIN DELO,

            Defendant.         Sentence
------------------------------x

                               New York, N.Y.
                               June 15, 2022
                               4:45 p.m.

Before:

                  HON. JOHN G. KOELTL,

                            District Judge

                     APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  SAMUEL RAYMOND
     THANE REHN
     Assistant United States Attorneys

SMITH VILLAZOR LLP
     Attorneys for Defendant
BY:  PATRICK J. SMITH
     ANDREW J. ROGERS
     -and-
FOLEY HOAG LLP
BY:  HARLAN LEVY

(Case called)

MR. RAYMOND:  Good afternoon, your Honor, Samuel Raymond and Thane Rehn for the government.

THE COURT:  Good afternoon.

MR. SMITH:  Good afternoon, your Honor, Patrick Smith for Ben Delo, who is here in court, together with Harlan Levy and Andrew Rogers.

THE COURT:  You'll have to excuse me.  I have laryngitis today.

I received the presentence report, prepared April 12, 2022, revised May 17, 2022.  I have received the defense submission, dated June 1, 2022, and the government's submission, dated June 7, 2022.

Mr. Smith, have you reviewed the presentence report, the recommendation, and the addendum and discussed them with the defendant?

MR. SMITH:  I have, your Honor.

THE COURT:  Do you have any objections?

MR. SMITH:  We had a series of objections, your Honor, none of which go to the guidelines calculation, so we agree that the presentence report's guidelines calculation mirrors the plea agreement.  We don't think there is any unresolved factual issues your Honor needs to take up.

THE COURT:  I'll listen to you for anything that you would like to tell me in connection with sentence, any

statement you'd like to make, anything at all you'd like to tell me.

MR. SMITH:  Yes, your Honor.  May I use the lecturn?

THE COURT:  Yes, please.

MR. SMITH:  Your Honor, I'd like to frame what I think is at issue this afternoon and tell you which points I hope to briefly address.

In light of the probation department's recommendation of a sentence of probation and the government's view that a sentence of probation with a term of home confinement is appropriate, in view of the sentence that your Honor imposed on codefendant Arthur Hayes, and without intending in any way to be presumptuous about the issue of potential incarceration, I'll simply say that a term of incarceration is unnecessary in this case for the reasons we have argued in writing in our sentencing submission and for the additional reason, as noted and agreed to by the government, that it would create this unwarranted sentencing disparity with Mr. Hayes.

Instead, I am going to focus my remarks on why a term of probation, as recommended by the probation department, without a term of home confinement to be served in Mr. Delo's country of residence, is the appropriate sentence in this case.

I am going to take up the following points as I address that issue.

First, I am going to talk about Mr. Delo's role in the

offense and how it's less serious than Mr. Hayes' role. Less serious, largely because Mr. Delo was not a policy maker with respect to BitMEX's compliance policies and because Mr. Delo actually took numerous steps personally to get at the issue of U.S. users on the BitMEX platform.

I am also going to talk a bit about the circumstances of Mr. Delo's citizenship ███████████████████ ████████████████████████████████████████ ██████████████████████████ ████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████ ██████████████████████ Seems like it would be unnecessarily punitive under the circumstances of this case.

Where I'd like to start, your Honor, is with Ben, the person, who is before the Court for sentencing today. I began representing Ben at the end of 2018, shortly after the CFTC investigation commenced.

I think it's important to point out that Ben has consistently cooperated with that investigation and the DOJ investigation that followed. Ben and his partners, Arthur Hayes and Sam Reed, directed the company's lawyers to cooperate with those investigations. Ben never shirked or shied away from dealing forthrightly with the issues.

He came to the United States voluntarily in, I think

it was June of 2019. He gave a full day of testimony from the CFTC. The evidence upon which the prosecution has been built is the byproduct of the cooperation that Mr. Delo authorized and directed.

But I really got to know Mr. Delo, Ben, after October 1, 2020, when this case was first announced and the indictment was unsealed. As you can well imagine, I spent an awful lot of time going over the issues in the case, thinking about strategy and how to deal with the fact that Ben is a British citizen, was temporarily in the United Kingdom, and had not yet been arrested.

In those discussions, and we spent many hours together on the phone, on Zoom calls, I really began to understand just how unique and special a person Ben Delo is, how, frankly, brilliant he is and how focused he was on the case. Most importantly is that his main concern was that he is worried about the impact of the case on people and concerns other than himself.

Now, there is a series of letters that have been submitted in support of Ben and this sentencing. I have reread all of those letters just in the days coming up to sentencing here. It's really striking what jumps off the page in terms of the extraordinary qualities that are present in this one human being, just some of the attributes that his friends and family talk about in these letters, Ben's generosity, his kindness,

his loyalty, his intellectual curiosity, his academic brilliance, how compassionate he is, and that he has a deep abiding concern for the welfare of mankind. And I would say in my experience, your Honor, this is atypical in criminal defendants. It's atypical in people generally.

I would like to add an additional positive attribute that I am not sure was mentioned in the letters. That's courage. Ben never wavered in his belief that he should come to the U.S. promptly, face this case head on. He had an option to go through an extradition proceeding. He didn't want to do that.

He didn't want to drag it out, have an extradition proceeding in the UK, maybe even win, ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. He just didn't want to do it. He consistently wanted to come face the issues head on directly and move this case forward as promptly as possible. Those were always the instructions to me.

As we worked through all the issues facing him and his concerns, it became clear to me that the biggest concern to Ben was how this case would impact the philanthropic goals he set for himself, how this would impact his ability to take his newfound wealth from founding BitMEX and helping others with a real purpose to effect real change in this world for the benefit of all, and that is truly unique and, again, not just among criminal defendants, but for anyone. And Ben placed

these goals ahead of any risk of fear that this case could lead to a prison sentence.

A lot of the letter writers have conveyed personal anecdotes about Ben's generosity. I think there is a letter from ███████████ that talks about a series of donations that Ben has made that, while not very large, had an outside impact on people. And there is letters from, for example, Worcester College at Oxford where Ben gave a quite sizeable donation.

I actually have my own personal anecdote to share about Ben's generosity because in the fall of 2020, as Ben and I were working through the issues and Ben was explaining to me how important his philanthropic goals were to him, I noted that there is a charity that I have supported over the years and explained to him why it's important to me and why I support it, but I did not solicit anything from Ben.

Well, within about a week, Ben, unsolicited, made a sizeable donation to this charity. In fact, it was of such size that it was about 10 percent of the fundraising budget for this charity in the year, and I was a little bit taken aback. But I think that's just Ben. I think that's what Ben's supporters have sought to convey to the judge about Ben thinking of others and being a truly generous person.

The government has tried to make this a case about greed. I think they have argued quite explicitly that this

Bank Secrecy Act violation was motivated by a desire to make money, real financial motive part of the case. But I think Ben's track record of giving and generosity really blunts that claim and it's a track record that goes way before any investigation into BitMEX's compliance policies ever started.

In the spring of 2018, Ben received his first sizeable dividend from BitMEX, and he started giving it away.

He later signed, I think this was in early 2019, the Buffett Gates Giving Pledge, where he, like a list of other wealthy individuals, had pledged to give away a substantial portion, that's half of their wealth.

We are going to talk a little bit more about the offense conduct in a bit, but I think the greed angle that the government is advancing as to Ben just doesn't work.

When we talk about Ben's qualities, I want to also just note, I think it's clear from some of the letters, but that Ben is an exceptionally talented computer scientist, mathematician, and those were essential components of BitMEX's success.

We are here because of this Bank Secrecy Act violation and admitted failure, and Ben has acknowledged his guilt on that. But we shouldn't lose sight of the fact of what a tremendous accomplishment the BitMEX platform was and is.

Ben's role was to write the code for the trading engine, bringing his computer science and financial products

expertise to bear on that. He invented some of the platform's leading products, including something called a perpetual swap, which has been widely copied in the crypto-derivative markets. He developed a novel self-clearing system for the platform.

In a word, what Ben brought to the table and applied was just simply brilliant. And the three of them, Arthur Hayes and Sam Reed together, really, as entrepreneurs, created something special.

Yet, Arthur Hayes, as the thought leader on crypto, in it with his energetic and thought-provoking promotional ideas, some controversial, but that's what he brought to the table.

Sam Reed programmed the front end of the platform, the user interface and the customer experience, designed the website.

And Ben brought his talents to bear on the trading engine.

BitMEX became a market leader in the crypto-driven space because of the innovation and expertise that Ben and his cofounders brought to the project. BitMEX always operated fairly as designed, as disclosed on the website. They custody billions in crypto-assets, never missed a withdrawal. Withdrawals are processed daily. I don't think we should lose sight of the fact that BitMEX operated fairly.

We are here for this Bank Secrecy Act violation, but it's a still a tremendous accomplishment. And it's an

accomplishment, I should note, that Ben achieved after he overcame Asperger's, with which he was diagnosed as a child. I think that makes this success all the more remarkable.

In short, Ben's track record of doing good in the world, using his wealth for unselfish purposes, with a view towards helping human kind, present a unique basis to consider leniency in this case.

I would just add, in terms of my relationship with Ben, it's really been a privilege to represent him. He's a truly unique person.

I am going to switch gears and talk a little bit about the offense conduct and Ben's role in it. The government has a rather stark black-and-white view of things. As noted, I think it's a financially driven motive case, desire to make money over anything else. They have a view that BitMEX and Ben essentially targeted the U.S. market intending to violate the Bank Secrecy Act all along and that Ben participated in or led that conduct. To say that the government's position lacks nuance is a bit of an understatement.

What's really missing from the government's version of the offense conduct is any recognition that Ben's role was primarily focused on making sure the trading engine worked, developing the code, making sure that it functioned, and that Ben was not the person at BitMEX who set BitMEX's compliance policies. That was Arthur Hayes's role. In their submission

they talk about, and in the PSR we see statements attributed to what the founders knew and did. But when you actually look at the communications that they cite to and the PSR cites to about attitudes towards compliance, attitude towards KYC, attitudes towards U.S. regulation, I'm pretty sure that all of them, virtually all of them, are Arthur Hayes' words in either AN e-mail to others or in a blog post or in a communication to prospective investors and others with relationships with BitMEX.

It was Arthur Hayes who was the so-called thought leader on crypto-products and cryptocurrency. It wasn't really Ben's role at all. I'm not saying that Ben didn't know about what was happening. I'm not saying he didn't understand that if they were in the U.S., there were going to be obligations for being in the U.S.

THE COURT: It's undisputed that he did know that there were some and that when the compliance program began to ratchet up, if you will, he knew that it was late in purging U.S. accounts.

MR. SMITH: It is undisputed, and I think we have actually laid that out. We agree with that completely. I take issue with the idea that Ben sat around with Arthur Hayes or anyone else in 2014, when they were founding this platform, and formulated a plan to flout U.S. law and said, we don't care about the U.S.

THE COURT:  Some of the arguments in the papers are a little misdirected, in any event, because they talk about the period prior to the period in the indictment, which dates to 2015 rather than 2014.

Go ahead.

MR. SMITH:  I also think it's important to understand and see things a bit from Ben's perspective because he's a British citizen, not a U.S. citizen.  He is living in Hong Kong, where BitMEX was headquartered, and he's writing computer code for this trading system.  And, over time, U.S. users find their way onto the platform.

But, as a baseline matter, Ben was not subject to U.S. law.  What makes him subject to U.S. law is the fact that U.S. users -- he understands the U.S. user on the platform and understands that the systems are not adequate to keep them off.  But that's a very different thing than saying there was a plan to go out and violate U.S. law from the outset.

I think the government would agree, and I think it's alleged in the indictment, that when September 2015 comes around and the CFTC begins to assert jurisdiction over cryptocurrencies, that BitMEX implemented or stated a policy to keep U.S. users off the platform.

I think, as your Honor just noted, the case is really about whether the policy and the implementation of the measures to keep people off -- U.S. persons off the platform were

sufficient.

Really what the case is is a compliance failure, a criminal compliance failure, because the systems to keep the U.S. users off the platform didn't work adequately enough.

The government derides these policies as purposely ineffective, but I don't think really think that's the case. I don't think that's accurate. It's a very different thing from saying U.S. customers are banned versus actually having some type of, as they have suggested, secret policy of encouraging U.S. users. The government says that occurred, but I don't think there is really any evidence that Ben Delo ever encouraged U.S. users to circumvent the policy, use things like virtual private networks to get on the platform. That's just not in the evidence as to Ben Delo.

What we see is that Ben's knowledge of U.S. users on the platform accretes over time. It builds up. He didn't have a role with respect to marketing or business development. It is just not in the record that he encouraged U.S. users to get on the platform.

The government points to various reports which they claim show knowledge on Ben Delo's part that there were S users on the platform. They pointed to these so-called country revenue reports. But the country revenue reports really are a backward-looking recategorization of users who had been registered under one country, but because measures that Ben and

BitMEX actually put in place, caught those people out of them as U.S. users, restricted their trading privileges, and then recategorized them as U.S.  So they are in the records of the company as U.S., but from the day they were flagged as U.S. forward, they were not permitted to trade on BitMEX.

They also point to a report called the analytics report from 2017 which they claim shows U.S. people trading on the platform and it being the most popular jurisdiction.  But the analytics report is not a record of actual deposits and actual trading on the platform.  It is an analysis of web traffic not drawn from the trading data.

THE COURT:  There is no question, though, that the defendant knew that U.S. users were using the platform and that, as a result of that, it was necessary for the company to comply with AML and KYC procedures, and he knew that they didn't.

MR. SMITH:  Your Honor, I would say yes, but it's a question of timing, and what was the extent of that issue.

I think if the government is telling the timing is from inception, then the number of U.S. users was large and Ben didn't do anything to stop it.  When, actually, what happened was, Ben did quite a bit to restrict U.S. users and, as your Honor has pointed out, they were there.  The restrictions didn't go far enough.

But what I would say was, they were directionally

correct, and they were meaningful in terms of limitations on the volume of business out of the United States, not enough to free him and BitMEX from being jurisdictionally present in the U.S., but substantial in terms of the limitations on U.S. users.

I think maybe what I should do now is just sort of give a little brief summary of what Ben did to restrict U.S. users.

First, the policy itself turns people away because if you get on the website after 2015, it says U.S. users are unwelcome, so there is some uncounted number of people who never sign up just because they are being told, if you are in the U.S., you can't trade with us.  You have to fill out a form, and there was an IP ticket registration.  If you put U.S. or your IP came back to the U.S., the account was placed on a list and there were no trading privileges.  They kept a list of people who were turned away because they tried to sign up but were detected or disclosed as having a U.S. connection.  Over time, 58,000 such registered users were never given trading privileges.

THE COURT:  I know what your expert report says.  The government disagrees with the total amount.  The government points to other statistics which tend to indicate some indications of the volume of U.S. users.  At the end of the day, the defendant pleaded guilty to the violation of the Bank

Secrecy Act for knowingly and willfully having caused the company to fail to comply with the Bank Secrecy Act when he knew he had to comply.  That's what we deal with.

MR. SMITH:  I suppose, your Honor, the modest point is that it's a mitigating circumstance that there were controls that were real and substantially reduced the U.S. user problem.

THE COURT:  And that the defendant was actively involved in enforcing that control.

MR. SMITH:  Indeed, he was involved not only at the technical level by devising implemental controls, but also at the customer service level, where there are hundreds and hundreds of customer support tickets where Ben personally deals with someone who presents as a U.S. user and then has their account restricted.

I guess I point this out because I don't think this case is the black-and-white preplanned violation of the Bank Secrecy Act that the government portrays it as but, rather, a more as a result of adverse facts coming to Mr. Delo's attention and a failure, a criminal failure to do enough about it.  I think that's the point that your Honor has made back to me.  At the end of the day, the violation is the violation, but I don't think it was conceived as part of a plan to design BitMEX to violate U.S. law.

I'll leave it at that, your Honor.  I think that the offense conduct is not nearly as serious as the government

makes it out to be. And I would say, in comparison to Mr. Hayes, who led BitMEX as CEO, who came up with the policies regarding what should be done about know your customer and AML policies, that in the context of the two of them, Mr. Delo is less culpable and that should be an important factor in how your Honor sentences Ben and whether your Honor believes that a term of home confinement and any sentence of probation is really necessary here.

I'd like to turn just briefly to Ben's visa status. I think it's clear from papers that Ben is not a citizen. He has no residence in the United States. I think it's unclear,

. I wouldn't want to see Ben get cross-waged with the immigration authorities.

As a result of this offense, our best understanding is Ben is not deportable, nor is he excludable on the basis of this Bank Secrecy Act defense principally, because this is not a crime of moral turpitude. It's not the case, as the government has argued, that

So we want to preserve Ben's ability to reenter the United States in the future, and

Your Honor, I'll wrap it up now and simply state our requested sentencing, and that is consistent with the

recommendation of the probation department to sentence Ben to a term of probation and permit him to serve that probation in his country of residence.

As to fine, like Mr. Hayes, no fine should be imposed because Ben has fully satisfied the plea agreement by paying the full civil monetary policy to the CFTC as required.

Thank you, your Honor.

THE COURT:  Thank you.

Mr. Delo, have you reviewed the presentence report, the recommendation, and the addendum and discussed them with your lawyer?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Do you have any objections?

THE DEFENDANT:  No, your Honor.

THE COURT:  I'll listen to you for anything that you wish to tell me in connection with sentence, any statement you'd like to make, anything at all you'd like to say.

THE DEFENDANT:  Thank you, your Honor.  I appreciate the opportunity to address the Court directly.

When I look back at what brings me here, I see a fundamental failure to address a known flaw in our systems.  I did not act quickly enough or effectively enough to ensure that we were not serving U.S. customers.  It was a terrible decision, the consequences of which I have to carry the rest of my life.

I want to start by thanking my friends and family. They have no part in the conduct that brings me before the Court, but they have had emotional scars for supporting me during this period.

I thank ████████████████████████ ████████████████████████████████ ████████████████████████████████ ██████████████████████████████ ████████████████████

Second, I want to acknowledge the adverse impact this case is having on my philanthropy and my ability to carry out plans to give away the majority of my wealth. One example is the ████████████████████. I planned to endow the foundation, which is set up to help children with Asperger's Syndrome, like me. ████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████. The collateral consequences will delay and reduce resources available to children with autism and Asperger's Syndrome, and I know the help that I received as an 11-year-old put me on a path that would not have been possible without it. That is what I hope to achieve for others.

Please consider the impact of the length and type of sentence you impose on me in terms of its effect on its ability for me to carry on with my charitable work that I began long

before any investigation that led to this case.

I close by thanking the prosecutors. Why they have said some things about me with which I disagree, I understand they have a job to do and work very hard. And ultimately the plea agreement reflects a fair resolution of the BSA charge against me.

Your Honor, I deeply regret the actions that bring me here. Please accept my assurance that this will be -- regardless of any sentence you impose, this will be my only encounter with the criminal justice system. Thank you.

THE COURT: Thank you, Mr. Delo.

Has the government reviewed the presentence report, the recommendation, and the addendum?

MR. RAYMOND: Yes, your Honor.

THE COURT: Does the government have any objections?

MR. RAYMOND: No, your Honor.

THE COURT: I'll listen to you for anything that the government would like to tell me in connection with sentence.

MR. RAYMOND: Thank you, your Honor. I'll be brief.

Just to begin with, I think there is no disagreement on the most important facts in this case.

The defendant willfully violated the Bank Secrecy Act. He did that because he knew that BitMEX was operating in the United States because U.S. users were using the platform to trade, and he failed to remediate that and that the defendant

played a leadership role in the offense, as he admitted in his plea agreement and as the parties negotiated.

The 3553 factors, I just want to mention for a moment and to respond to some of the points made by defense counsel.

The first is the seriousness of the offense and Mr. Delo's role in comparison to Mr. Hayes. Both defendants, both Mr. Delo and Mr. Hayes, accepted their role as leaders of BitMEX's criminal conduct. The government absolutely agrees that they had different responsibilities at BitMEX. But that does not mean that they are differently situated for purposes of sentencing.

First, as defense counsel themselves recognize, BitMEX, as they call it, was a quintessential tech startup story. That meant, as I don't think there is a dispute, at BitMEX's inception each of the three defendants charged, the founders of this company, were making decisions collectively, and they put on different hats as the company was first launched. That meant that at times Mr. Delo did have a compliance function. He responded to customer support tickets.

Defense counsel mentioned that the statements that the government cites in the sentencing letter and in the PSR were overwhelmingly, if not exclusively of Mr. Haynes. I think that's true. But it's notable, they were most often to Mr. Delo and to Mr. Reed. Mr. Delo understood exactly what Arthur Hayes was saying, and these were decisions they were making

collectively.

Given Mr. Delo's background in financial services, the government submits he had to understand what the consequences of operating BitMEX without an AML policy was.  As the government described at length in Mr. Hayes' sentencing and references in the sentencing letter here, the defendant's company did not dispute the conclusion by FinCEN that BitMEX allowed more than $200 million in suspicious transactions, which is directly related to its failure, knowing and willful failure to implement an AMF program.

With respect to Mr. Hayes as well, as the defendant described in his own sentencing letter, it was his responsibility.  While Mr. Hayes had the responsibility in marketing and compliance, it was his responsibility to improve U.S. user controls in 2018.  That is the primary way, as I believe the parties agree, by which Mr. Delo willfully violated the Bank Secrecy Act, by operating the company by BitMEX's operations in the United States, and that was his responsibility, not Mr. Hayes'.

Finally, your Honor, with respect to some of the personal characteristics that the defendant described, ultimately the decision to violate U.S. law, including the decision to violate U.S. law from outside the United States, was Mr. Delo's.  The consequences of that decision should not be that because he is not a U.S. citizen that he willfully

flouted our laws that he should be able to receive a sentence that is not commensurate with his criminal conduct and with similarly situated defendants, like Mr. Hayes.  Mr. Delo violated U.S. law, and he should be punished appropriately under U.S. law.

So for those reasons, your Honor, the government respectfully submits that the Court should impose a sentence commensurate with that of Mr. Hayes, including six months of home confinement.

THE COURT:  Thank you.

I will place the presentence report, the recommendation, and the addendum in the record under seal together with the party's submissions to me.

The parties should place their own submissions in the record not under seal, after redacting any personal identifying information.

I adopt the findings of fact in the presentence report.  Therefore, I conclude that under the current guidelines the total offense level is 10, the criminal history category is I, and the guidelines sentencing range is six to 12 months.

As the parties recognize, because the guideline in this case is in zone B, a sentence consistent with the guidelines would be not only a sentence of imprisonment of six to 12 months, but also, among other sentences, a sentence of

probation with a condition of home confinement for six to 12 months. See guidelines Section 5C1.1(c).

I appreciate that the guidelines are only advisory and that the Court must consider the various sentencing factors in 18 U.S.C. Section 3553(a) and impose a sentence that is sufficient but no greater than necessary to comply with the burdens of proof set forth in Section 3553(a)(2).

In this case, the defense and the probation department recommend a slight downward variance from the guidelines with a recommendation of probation and the elimination of the provision of any condition of home confinement.

The government acknowledges that it had sought an upward variance for a codefendant in view of its belief in the seriousness of the offense, the amount of money involved in the offense, and the fact that the guidelines do not accurately reflect the amount of money involved. But the government recognizes that the Court imposed a guidelines sentence in the case of a codefendant, including six months' home confinement, together with probation, and seeks the same sentence here.

As with the codefendant, the Court agrees that the offense is very serious. The defendant willfully caused his company to violate the Bank Secrecy Act by failing to establish anti money laundering and know-your-customer procedures. The defendant is a sophisticated businessman.

He knew that these procedures were required to avoid

his companies being used for money laundering and other criminal activities. He admittedly knew that it was necessary for his company not to service United States customers in order to avoid the regulatory procedures required by the Bank Secrecy Act, but he admittedly knew that his company nevertheless serviced United States customers and was required to have these procedures.

On the other hand, it is also true that the company implemented procedures over time to attempt to screen out United States customers and did screen out a considerable amount of business from United States customers. But given the admittedly willful nature of the violation, the crime remains a serious one.

On the other hand, the government chose not to accuse the defendant of money laundering or fraud, although the government points to these offenses in its sentencing memo.

There are no identifiable victims of the offense and no need for restitution. There has been disgorgement as a result of the payment of the $10 million CFTC penalty.

The history and characteristics of the defendant weigh strongly in the defendant's favor. This is the defendant's first offense, and the defendant overcame a significant childhood disability to achieve his academic and business success.

The defendant has a record of extraordinary charity,

some of it anonymously given, and this record is long standing and predates his involvement in the current prosecution so that it could not be attributed to a desire to make a record for a sentencing court.  It is a reflection of the character of the defendant.

There is a need for a sentence that is sufficient to deter the defendant from engaging in a willful violation of the criminal laws again.  There is also a need, as the government points out, to avoid unwarranted sentencing disparities among defendants with similar records who have been guilty of similar conduct.  See 18 U.S.C. Section 3553(a)(6).  And the Court is well aware that it sentenced a codefendant to a guidelines sentence of two years' probation, with a condition of home confinement of six months, which is a guidelines sentence.

There are some distinctions between the defendant and his codefendant.  As the government recognizes, the codefendant to whom the Court sentenced to two years' probation with six months' home confinement had more responsibility over the company's marketing and compliance functions than Mr. Delo.  Government memo at 11.

Significantly for the Court, the defendant is not a citizen of the United States and has never lived or worked in the United States.  Even during the course of the pretrial proceedings in this case, the defendant resided in Bermuda.  The parties have not suggested a reasonable or practical way

for the probation department to monitor home confinement abroad, and it would be unreasonable to require the defendant now to take up residence in the United States.

Ultimately, the Court concludes that attempting to fashion an addition of home confinement to a sentence of probation for this defendant would be greater than necessary to achieve the relevant purposes of sentencing.

On the other hand, without the condition of home confinement, a period of two years' probation, which will be served abroad, does not reflect the seriousness of the offense. On balance, therefore, the Court intends to sentence the defendant to a sentence of probation of 30 months without a condition of home confinement.

The Defendant will be subject to the mandatory and standard conditions listed on pages 52 to 53 of the presentence report. I will not impose drug testing because the defendant is a low risk of substance abuse. The defendant must cooperate in the collection of DNA, as directed by the probation office. The defendant must obey the immigration laws and comply with the directives of immigration authorities.

The defendant's obligation to pay a $10 million fine has been satisfied by his payment of the $10 million penalty to the CFTC. I will not impose any other financial conditions on the defendant because there are no other financial obligations other than the payment of the special assessment. The

defendant must pay a special assessment of $100.  The Court will not impose restitution because there is no victim under 18 U.S.C. Section 3663.  No forfeiture is sought.

The sentence is consistent with the factors in Section 3553(a) and is sufficient but no greater than necessary to comply with the purposes of Section 3553(a)(2).

I've explained the reasons for the sentence.

Before I actually impose the sentence, Mr. Smith, I'll recognize you for anything you wish to say.

MR. SMITH:  Yes, your Honor.

With regard to the period of probation, I would ask that your Honor make it express that Mr. Delo is permitted to serve that sentence of probation in his country of residence and is otherwise permitted to travel internationally.

THE COURT:  I think I made those recommendations or provisions in the case of Mr. Hayes.  Yes.

MR. SMITH:  Your Honor also indicated that you would order the standard conditions of supervision.  There are certain of those conditions that, under the circumstances, wouldn't apply.  So I guess what I would ask is that your Honor consider waiving the standard conditions.  Otherwise, I would go down the list here.  For example, there is a requirement to, number 1, report to the probation office in the district where he is authorized to reside.  Since he's authorized to reside outside of the U.S., that really wouldn't apply.

THE COURT:  It would be --

MR. SMITH:  I guess the request is --

THE COURT:  Hold on.  The defendant is required to report to the probation office in this district within 72 hours.

MR. SMITH:  That we understand and we can comply with, but the actual text of the condition is in the district where he resides.  That's fine.  But there are other reporting instructions in terms of travel and things like that that just don't -- are just sort of unworkable if your Honor is permitting him to reside outside of the United States.  I would simply say, please consider the standard conditions of supervision and how they apply to a sentenced defendant who is permitted to reside outside the country and permitted to travel internationally.

THE COURT:  You can take it up with probation.  The only change that I made for the codefendant was condition number 8, to allow contact with Mr. Delo and Mr. Reed, I believe.

MR. SMITH:  Yes.  We would ask that the same exception be made for Mr. Hayes and Mr. Reed.  Ordinarily, after reporting to probation, Mr. Delo would require leave of the Court to travel internationally.  So I would ask your Honor to authorize Mr. Delo to depart from the United States.  Within the next 24 to 48 hours, he is going to return to Bermuda, and

thereafter, he is going to return to Hong Kong.

THE COURT:  He can travel abroad after reporting to the probation office.

MR. SMITH:  May I have a moment, your Honor?

THE COURT:  Sure.

MR. SMITH:  Nothing further, your Honor.

THE COURT:  Before I actually impose the sentence, Mr. Delo, I'll recognize you for anything you wish to tell me, anything you'd like to say, anything at all you'd like to tell me.

THE DEFENDANT:  No.  Thank you, your Honor.

THE COURT:  Mr. Raymond, I'll recognize the government for anything you wish to tell me.

MR. RAYMOND:  Nothing from the government, your Honor. Thank you.

THE COURT:  Pursuant to the Sentencing Reform Act of 1984, it is the judgment of this Court that the defendant, Benjamin Delo, is hereby sentenced to probation for a period of 30 months.  As I've indicated, the defendant will be allowed to travel abroad and to reside abroad.

Within 72 hours, the defendant shall report in person to the probation office in this district.  While on probation, the defendant shall comply with the standard conditions of probation in this district.  He will comply with the mandatory and standard conditions of probation in this district as listed

on page 52 to 54 of the presentence report.

The defendant shall not commit another federal, state, or local crime. The defendant shall refrain from any unlawful use or possession of a controlled substance. The defendant shall obey the immigration laws and comply with the directives of the immigration authorities. The defendant must cooperate in the collection of DNA as directed by the probation officer.

It is further ordered that the defendant shall pay to the United States a special assessment of $100 which shall be due immediately.

I have explained the reasons for the sentence. Before I actually impose the sentence, does either counsel know of any legal reason why the sentence should not be imposed as I have so stated it?

MR. SMITH:  No, your Honor.

MR. RAYMOND:  No, your Honor.

THE COURT:  I'll order the sentence to be imposed as I have so stated it. The sentence is imposed on Count One of the indictment.

There is a waiver of the right to appeal the sentence, am I correct?

MR. RAYMOND:  Yes, your Honor.

THE COURT:  Does either counsel know of any legal reason why the waiver is not effective?

MR. SMITH:  No, your Honor.

MR. RAYMOND:  Neither from the government, your Honor.

THE COURT:  Mr. Delo, the reason that I ask these questions is that generally a defendant has the right to appeal the sentence.  The notice of appeal must be filed within 14 days after the entry of the judgment of conviction.  The judgment of conviction is entered promptly after the judge announces the sentence.

If the defendant cannot pay the cost of appeal, the defendant has the right to apply for leave to appeal *in forma pauperis*.  If the defendant requests, the clerk will prepare and file a notice of appeal on the defendant's behalf immediately, and the rules require that a court inform the defendant of this right to appeal the sentence.

In this case the parties advise that you have given up or waived your right to appeal the sentence, and I'm confident that when I took your guilty plea I went over with you the waiver of this right to appeal the sentence.  So it appears that you have given up or waived your right to appeal the sentence, but I go over this with you now because I want to make sure that you talk to your attorneys about it so that you are fully informed of all of your rights.

Do you understand what I have said?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  As a matter of prudence, the government moves to dismiss any open counts?

MR. RAYMOND:  Yes, your Honor.  The government moves to dismiss Count Two of the indictment.

THE COURT:  And the defense agrees?

MR. SMITH:  Yes, your Honor.

THE COURT:  All open counts dismissed on the motion of the government.

Anything further?

MR. SMITH:  Yes, your Honor.  We would ask that bail be exonerated.  May I submit a proposed order directing the clerk of the court to return the cash bail deposit?

THE COURT:  Yes, sure.

Anything else?

MR. SMITH:  No, your Honor.

MR. RAYMOND:  Nor from the government.  Thank you, your Honor.

THE COURT:  OK.  Good afternoon, all.

(Adjourned)